[No. H023336. Sixth Dist. Sept. 27, 2002.]

Estate of JOSE INEZ GONZALEZ, Deceased.
ROSALINDA GONZALEZ CORTEZ et al., Petitioners and Respondents,
v.
JORGE GONZALEZ, as Executor, etc., Objector and Appellant;
ROY GONZALEZ, Claimant and Respondent.

## COUNSEL

Boskovich, Gorini & Vanasse and Richard A. Gorini for Objector and Appellant.

Law Office of Patrick E. Standifer and Patrick E. Standifer for Petitioners and Respondents and for Claimant and Respondent.

## OPINION

**WUNDERLICH, J.**—Rosalinda Gonzalez Cortez, Enedina Gonzalez Marquez, and Roy Gonzalez, the three full siblings of Jorge Gonzalez,[1] filed a petition to enforce a no-contest clause in their father's will against Jorge. The trial court granted the petition, which was denominated a "petition to determine entitlement to estate distribution to Jorge Gonzalez because he violated the will's forfeiture clause." Jorge appeals from the trial court's order granting the petition. We shall affirm.

### FACTS

Jose Inez Gonzalez died on March 30, 1998, at the age of 81. He left 12 children, ranging in age from 18 to 66, some living in the United States,

---

[1] Jorge also has eight half siblings on his father's side. They are not involved in this litigation. To avoid confusion, we will refer to the various parties by their first names in this opinion.

some in Mexico, some legitimate, some not. He owned real property in Mexico and in San Jose. In 1992, the decedent wrote a will dividing his estate equally among the four children born of his marriage to Carmen Garza Gonzalez, to wit: Enedina, Rosalinda, Roy and Jorge. The 1992 will named Jorge, the youngest of the four and a sergeant with the San Jose Police Department, as the executor of his father's estate. The will also contained a no contest clause, providing: "If any beneficiary under this Will in any manner, directly or indirectly, contests or attacks this Will or any of its provisions, any share or interest in my estate given to that contesting beneficiary under this Will is revoked and shall be disposed of in the same manner provided herein as if that contesting beneficiary had predeceased me."

In 1993, Jose gave Jorge a general power of attorney. In addition, according to Jorge, he was his father's primary caretaker for the last six years of his father's life. Judge Richard Turrone, however, refers in his statement of decision to 22-year-old daughter Alma as the decedent's "caretaker at the time" of his death. (Alma is not a party to this lawsuit.)

In early March 1998, just three weeks before Jose died, Jorge delivered to Jose for his signature (1) a grant deed that transferred title of Jose's San Jose house to Jorge,[2] and (2) a will essentially disinheriting Jose's other children and leaving Jose's entire estate (i.e., the property in Mexico) to Jorge. The circumstances leading up to these events are set forth in greater detail in Judge Turrone's statement of decision, which will be quoted later.

After Jose died, Roy filed a petition for letters of administration on June 5, 1998. Roy was apparently unaware of either the 1992 will or the 1998 will and claimed his father died intestate. On June 19, 1998, Jorge filed his own petition for letters of administration. Each of the brothers then filed an objection to the other's petition. In July 1998, the court appointed Enedina to administer the estate.

Roy filed a "petition for conveyance of [real] property claimed to belong to the decedent," seeking to void the grant deed Jose signed three weeks before he died transferring the San Jose property to Jorge. Subsequently, the court ordered Jorge to take over as administrator of his father's estate, noting that both the 1992 and the 1998 wills had named him as executor. Jorge submitted the 1998 will for probate.

In April 2000, Enedina and Rosalinda, represented by separate counsel from their brother Roy, filed a "petition for conveyance of personal property

---

[2]The grant deed was filed with the Santa Clara County Recorder on March 6, 1998.

[i.e., funds held in joint bank accounts by Jose and Jorge] claimed to belong to the decedent." They also filed a motion to consolidate all matters before the probate court (i.e., Jorge's petition to probate the 1998 will, the siblings' contest of the 1998 will on the grounds of undue influence or fraud, the siblings' petition seeking a decree declaring the grant deed void, and the siblings' petition seeking to impose a constructive trust on funds in certain bank accounts).

In August 2000, a seven-day court trial was held before Judge Turrone. With respect to the 1998 will and deed, he found first of all that Jorge was in a confidential relationship with Jose. He further found that Jorge actively participated in procuring the grant deed and will, finding: "(1) The evidence is robust that Jorge actively participated in the preparation and the execution of both documents. [¶] (2) In her deposition, Alma, his caretaker at the time, testified that upon returning from the hospital the decedent would not eat, had a fever that came and went, complained of pain, and that he was unable to carry on a conversation with others. Because of the sores in his mouth he would mumble, mostly nodding as a means of communication. The hospital records substantiate that he suffered from 'severe thrust' [sic] and even in January of 1998 there are entries reflecting that he suffered from slurred speech. In fact, entries dating from a 1997 admission describe him as having a 'history of chronic slurred speech.' . . . [By contrast, medical records dating back 10 years earlier reflected he was fluent and coherent]. Alma further testified that at times he would confuse her with her sister, Blanca, and that he had become forgetful. The hospital records have notations that in early February 1998 he had begun to refuse to eat . . . and at times he had limited memory and was disoriented. . . . [¶] (3) The evidence is uncontradicted that Jose was wheelchair bound for several years before his death and relied solely on Jorge for management of his affairs. In March of 1998 he was in poor health and bed bound, having constant headaches for 6 months and a persistent cough. He was totally dependent on others for assistance - unable to bathe, eat, or perform personal hygiene without the assistance of others. He had been released from the hospital after a bout of pneumonia on February 11, 1998. The hospital records indicate that at varying times he was sometimes confused, alert or disoriented. He was extremely weak. [¶] (4) On March 1, 1998, Jorge came to the home unannounced, wrote out a statement for his father to sign, wherein Jose indicated an intent to give his home and ranch to Jorge . . . . Without Jose having an opportunity to review the document, Jorge presented it to him for signature while he was in bed after which he had Alma signed [sic] as witnesses. When Alma spoke to Jose following the execution of this document, to ascertain if he knew what he had signed, he merely shrugged. She describes him as half asleep at the time. [¶] (5) On March 2, 1998, on his own initiative, Jorge had his tax preparer

draft a grant deed conveying Jose's family home to Jorge. Jorge drove to the tax preparer's office in Gilroy with a copy of the deed conveying the property to Jose so that she would have the legal description. After picking up the deed that had been prepared, he drove to San Jose, picked up a notary, which he brought to his father's bedside and had him sign the deed. [¶] (6) Shortly thereafter, Jorge contacted a fellow sergeant with the San Jose Police Department, who he had known for approximately twenty years and who had recently become a lawyer. Jorge prepared an inventory of his father's property . . . and gave it to the lawyer. On March 8, 1998, the lawyer meet [*sic*] with Jorge at his father's home at which time Jorge provided the lawyer with a copy of an earlier will written by the decedent which had some changes marked upon it. During the consultation with the decedent and the lawyer, Jorge assisted the lawyer with language problems. Jorge was never asked to leave the room. After the lawyer prepared a draft of the will, the lawyer took it to Jorge's home so Jorge could review the rough draft. . . . Jorge arranged to have his best friend (another police officer) and a neighbor (whose daughter was formerly romantically involved with Jorge) to act as witnesses to the will."

Judge Turrone also found that Jorge "[u]nduly [p]rofited from the [w]ill and [d]eed," and that the "uncontradicted medical testimony is most compelling. The last health care professional to see the decedent on March 13, 1998, described him as frail, weak, incontinent, having cloudy urine, barely arouseable, disoriented, severely malnourished and severely dehydrated and, in a word, moribund. He describes him as slumped over in his wheelchair with the inability to keep his head up. He was skin and bones, possessing no muscle mass. He could not communicate. His prognosis was that he had less than a month to live. He was sent home to die. Shortly after arriving at home, he was put on house care but his condition was so poor that he was immediately given hospice care. [¶] (e) Dr. Steinke, noting that decedent was extremely dependent with limited capacity and a host of medical problems, expressed concern that the decedent, due to the lack of food and drink, which affects the thinking process, may not have understood what he was signing. The doctor, noting in addition the dehumanizing and demoralizing experiences suffered by the decedent along with all of the other medical problems, opined that the decedent was extremely susceptible to undue influence. He stated that on a scale of 1-10, with 10 being the maximum risk of undue influence, he rated the decedent's susceptibility at 12."

Following this recitation of the evidence, Judge Turrone found that "the purported will dated [March] 9, 1998 and the grant deed dated March 2, 1998 were the result of undue influence exercised by Jorge Gonzalez." Accordingly, the court denied probate of the March 9, 1998 will and granted

the petition voiding the grant deed of March 2, 1998. The court also denied the siblings' petition to impose a constructive trust on the bank accounts that Jorge had in joint tenancy with his father.

Shortly after the conclusion of the trial, both Roy and Jorge filed new petitions for appointment as executor and for letters testamentary, with copies of the October 1, 1992 will attached. The sisters and Roy each filed objections to Jorge's petition, and Jorge filed objections to Roy's. On December 18, 2000, the court ordered Enedina appointed as executor of her father's will. At that point, the sisters filed a "petition to determine entitlement to estate distribution to Jorge Gonzalez because he violated the will's forfeiture clause." (Capitalization omitted.) Jorge filed objections to the petition, Roy filed a reply in support of the petition, and then each party filed briefs in response.

The petition was heard by Judge Catherine A. Gallagher, who reviewed the entire file, including Judge Turrone's statement of decision, and who considered the numerous briefs and oral argument of counsel. She subsequently issued a five-page statement of decision finding that Jorge violated the 1992 will's no contest clause, thus subjecting him to forfeit any interest he had under that will. On June 14, 2001, she signed an order on the petition that "Jorge Gonzalez will take nothing from the estate." It is from that order that Jorge timely appealed.

## DISCUSSION

Jorge contends the trial court erred in finding him in violation of the will's no contest clause.　■　"The purpose of no contest clauses 'is to discourage will contests by imposing a penalty of forfeiture against beneficiaries who challenge the will.' [Citation.] 'An in terrorem or no contest clause in a will or trust instrument creates a condition upon gifts and dispositions provided therein. [Citation.] In essence, a no contest clause conditions a beneficiary's right to take the share provided to that beneficiary under such an instrument upon the beneficiary's agreement to acquiesce to the terms of the instrument.' [Citation.] Although no contest clauses are valid and favored by the public policies of discouraging litigation and giving effect to the testator's intent, they are also disfavored by the policy against forfeitures and therefore are strictly construed and may not extend beyond what plainly was the testator's intent. [Citations.] Section 21304 provides: 'In determining the intent of the transferor, a no contest clause shall be strictly construed.' Nevertheless, 'it is the testator's intentions that control, and a court "must not rewrite the [testator's] will in such a way as to immunize legal proceedings plainly intended to frustrate [the testator's] unequivocally expressed intent from the reach of the no-contest clause." [Citation.]' [Citation.] [¶] Section 21300, subdivision (b) defines a no contest clause as 'a

provision in an otherwise valid instrument that, if enforced, would penalize a beneficiary if the beneficiary brings a contest.' Section 21300, subdivision (a) defines a contest as 'an attack in a proceeding on an instrument or on a provision in an instrument.' ' "Whether there has been a 'contest' within the meaning of a particular no-contest clause depends upon the circumstances of the particular case and the language used. [Citation.]" [Citations.]' [Citations.]" (*Estate of Kaila* (2001) 94 Cal.App.4th 1122, 1128-1129, fn. omitted. [114 Cal.Rptr.2d 865].)

 Jorge argues that the no contest clause in his father's 1992 will should not be enforced against him because he had "reasonable cause" to offer the 1998 will to probate. The "reasonable cause" language comes from Probate Code section 21306, which provides: "(a) A no contest clause is not enforceable against a beneficiary to the extent the beneficiary, *with reasonable cause*, brings a contest that is limited to one or more of the following grounds: [¶] (1) Forgery. [¶] (2) *Revocation*. [¶] (3) An action to establish the invalidity of any transfer described in Section 21350. [¶] (b) *'Reasonable cause' is defined for the purposes of this section to mean that the party filing the action, proceeding, contest, or objections has possession of facts that would cause a reasonable person to believe that the allegations and other factual contentions in the matter filed with the court may be proven or, if specifically so identified, are likely to be proven after a reasonable opportunity for further investigation or discovery.*"[3] (Italics added.)

Here the beneficiary, Jorge, by offering the 1998 will to probate, "br[ought] a contest that is limited to . . . . [¶] . . . [¶] (2) Revocation." (Prob. Code, § 21306.) That is because the 1998 will revoked all prior wills, including the 1992 will with the no-contest clause ("I, JOSE INEZ GONZALEZ, a resident of Santa Clara County, California, declare that this is my will. I hereby revoke all my previous wills and codicils.") Thus, the only issue remaining is whether Jorge brought the contest with the requisite "reasonable cause" set forth in Probate Code section 21306. The trial court determined that he did not.

Jorge first argues that he should not be penalized because Probate Code section 8252 required that the validity of the 1998 will be determined before he could submit the 1992 will to probate. Probate Code section 8252 provides: "(a) At the trial, the proponents of the will have the burden of

---

[3]Section 21306 formerly read, before it was revised by Statutes 2000, chapter 17, section 6: "A no contest clause is not enforceable against a beneficiary to the extent the beneficiary, *with probable cause*, brings a contest that is limited to one or more of the following grounds: [¶] (a) Forgery. [¶] (b) Revocation. [¶] (c) An action to establish the invalidity of any transfer described in Section 21350. [¶] (d) A petition to remove a trustee under paragraph (6) of subdivision (b) of Section 15642." (Stats. 1995, ch. 730, § 11, p. 5480, italics added.)

proof of due execution. The contestants of the will have the burden of proof of lack of testamentary intent or capacity, undue influence, fraud, duress, mistake, or revocation. If the will is opposed by the petition for probate of a later will revoking the former, it shall be determined first whether the later will is entitled to probate. [¶] (b) The court shall try and determine any contested issue of fact that affects the validity of the will."

We agree with the trial court that Probate Code section 8252 cannot shield Jorge unless he had reasonable cause to believe that the 1998 will might be valid. Judge Gallagher stated, "Jorge cites Prob. Code, § 8252(a), a statute which requires that if a Will is opposed by the petition for probate of a later Will that revokes the former Will, the Court determines the validity of a *later* Will first. This argument is inapposite, as the chronological consideration of the 1998 Will first did not automatically subject Jorge to the 1992 Will's no-contest clause. If Jorge retained reasonable cause to believe that the 1998 Will and grant deed lawfully revoked the 1992 Will, Probate Code section 21306(a)(2) would shield his conduct." Offering a clearly sham will for probate is not what was meant or excused by Probate Code section 8252.

Jorge next argues that he had "reasonable cause" to offer the 1998 will for probate. He argues that using hindsight, he now knows that the will was invalid, but that when he offered the will for probate, he believed it was valid, relying on the advice of his counsel who expressed his personal belief that Jose was competent when he signed the will. In addition, he argues that the 1998 will could not have been patently invalid or his siblings would have brought motions for summary judgment or for a directed verdict, and the trial would not have lasted for seven days.

Reasonable cause, according to Probate Code section 21306 "mean[s] that the party filing the action, proceeding, contest, or objections has possession of facts that would cause a reasonable person to believe that the allegations and other factual contentions in the matter filed with the court may be proven or, if specifically so identified, are likely to be proven after a reasonable opportunity for further investigation or discovery." Although there are no reported cases that deal with the statutory definition of "reasonable cause" in the context of Probate Code section 21306, the concept has been discussed in other legal contexts, including under the California Tort Claims Act[4] and in the malicious prosecution context. As the California Supreme Court noted in a recent California Tort Claims Act case, "The

---

[4] Code of Civil Procedure section 1038 provides, in pertinent part, "(a) In any civil proceeding under the California Tort Claims Act or for express or implied indemnity or for contribution in any civil action, *the court, upon motion of the defendant or cross-defendant, shall*, at the time of the granting of any summary judgment, motion for directed verdict,

meaning of 'reasonable cause' has been the subject of some debate, but most courts do agree on its general interpretation. Several courts have found instructive the definition of 'probable cause' in the malicious prosecution context. [Citation.] The terms 'reasonable cause' and 'probable cause' are generally considered synonymous, with 'reasonable cause' defined under an objective standard as ' "whether any reasonable attorney would have thought the claim tenable." ' [Citations.] ▉ Another court stated, '*Reasonable cause* is to be determined objectively, as a matter of law, on the basis of the facts known to the plaintiff when he or she filed or maintained the action.' [Citation.]" (*Kobzoff v. Los Angeles County Harbor/UCLA Medical Center* (1998) 19 Cal.4th 851, 857-858 [80 Cal.Rptr.2d 803, 968 P.2d 514], original italics.)

Jorge argues that Judge Gallagher failed to apply the objective standard set forth in these cases and in the statutory language and rather applied a subjective standard. He specifically faults the following finding: "After a seven-day bench trial, Judge Turrone found that Jorge took advantage of his confidential relationship with his father and actively participated in procuring the 1998 Will and grant deed. The Court agrees with Judge Turrone's findings (we will not repeat them here) that Jorge's conduct constituted undue influence, which His Honor defined as 'coercion destroying the free will of the decedent, substituting for his own another person's will in compelling the decedent to make a disposition he would not otherwise have made.' Notice of Tentative Decision, 3:1-7. Because Jorge coerced his sick and elderly father to revoke the 1992 Will, the Court concludes that Jorge lacked reasonable cause to believe that the Will was lawfully revoked. [¶] . . . [¶] Jorge also purports to find reasonable cause from the fact that this petition to admit the 1998 Will to probate was never denied during the two years between the decedent's death and the trial itself (in the form of a technical or substantive defect or a dispositive motion such as summary judgment). Combined with pointing to a trial which lasted 7 days, Jorge suggests that a reasonable person could conclude that the 1998 Will and grant deed were valid (even though Jorge ultimately lost at trial). But neither the absence of dispositive pre-trial motions nor the quantity of days of trial

---

motion for judgment under Section 631.8, or any nonsuit dismissing the moving party other than the plaintiff, petitioner, cross-complainant, or intervenor, or at a later time set forth by rule of the Judicial Council adopted under Section 1034 *determine whether or not the plaintiff, petitioner, cross-complainant, or intervenor brought the proceeding with reasonable cause and in the good faith belief that there was a justifiable controversy under the facts and law which warranted the filing of the complaint, petition, cross-complaint, or complaint in intervention.* If the court should determine that the proceeding was not brought in good faith and with reasonable cause, an additional issue shall be decided as to the defense costs reasonably and necessarily incurred by the party or parties opposing the proceeding, and the court shall render judgment in favor of that party in the amount of all reasonable and necessary defense costs, in addition to those costs normally awarded to the prevailing party." (Italics added.)

affects Jorge's own internal possession of facts which would cause a reasonable person to believe that his attempted probate of the 1998 Will and procuring of the grant deed was lawful. It is Jorge's own conduct which belies reasonable cause, not the absence of pre-trial motions or the quantity of days it takes for a trial to conclude."

Jorge contends, "It is obvious, in reviewing Judge Gallagher's decision that she attempted to divine Jorge's subjective intent and did not make an objective judicial determination of the 'reasonableness' of Jorge's action." We disagree. Repeating once again the statutory definition of "reasonable cause," we see that it "mean[s] that *the party filing the* action, proceeding, *contest*, or objections *has possession of facts* that would cause a reasonable person to believe that the allegations and other factual contentions in the matter filed with the court may be proven or, if specifically so identified, are likely to be proven after a reasonable opportunity for further investigation or discovery." Before we determine what a reasonable person would do, we first impart to that hypothetical reasonable person all the facts known to the individual person who files the contest.

 Thus, the reasonable person would know that a confidential relationship existed between Jorge and Jose where Jose relied upon his son, that Jose was critically ill, disoriented, and not eating, that Jorge presented to Jose a statement he wrote out giving the house and ranch to Jorge, that Jorge had his own tax preparer draft a grant deed to the San Jose home, which he took to his father's bedside for his father's signature, along with a notary public he had brought over, that Jorge had a lawyer friend prepare the will without ever talking to the father alone, and that he had another police officer and a friend act as witnesses. Armed with these facts, would a reasonable person "believe that the allegations and other factual contentions in the matter filed with the court may be proven"? (Prob. Code, § 21306.) We do not believe so.

In Jorge's reply brief, he relies on two cases discussing good faith attempts to probate later wills that are spurious. The first is a 1919 California case, *Estate of Bergland* (1919) 180 Cal. 629 [182 P. 277, 5 A.L.R. 1363]. In that case, the testator executed a 1910 will, with a no contest clause, dividing his property between his three children. After his death, his daughter offered two documents for probate. The first was a holographic will, which read: " 'August 29, 1915. [¶] i give àl Money in Banks to my Dater Kate Misner when i Die. [¶] 'A. BERGLAND.' " (*Id.* at p. 631.) The second was a December 25, 1915, will which disposed of the property in a more advantageous manner for the daughter. As to the holographic will, the court noted, " 'Several testamentary instruments, executed by the same testator, are to be taken and construed together as one instrument.' " (*Id.* at p. 632.)

As to the December 25, 1915, will, the daughter dismissed her petition shortly before trial would have begun. Someone (the opinion does not say who) was convicted of forgery of the will. There was no evidence, however, as the court noted, that the daughter was cognizant of, or involved in, the forgery. The decedent's sons argued that their sister had lost all right to her legacy by her action in seeking the probate of the spurious will of December 25, 1915.

The lower court agreed, but the California Supreme Court reversed, explaining, "The forfeiture provision has no application to an attempt made in good faith to probate what purports to be a later will. The language of the clause is that if any beneficiary 'object to the distribution [of the estate] as made [by the will], or attempt to defeat the provisions of this will,' any gift to such beneficiary other than five dollars shall be annulled and revoked. *If an attempt were made knowingly to probate a spurious will of a later date which purported to distribute the testator's estate in a manner different from that of the genuine will, such an attempt would quite certainly come within the language of the forfeiture clause* as an attempt to defeat the provisions of the will. [Citation.] [¶] But it is not alleged in the present case that the daughter acted in bad faith in presenting the purported will of December 25, 1915, and seeking its probate, and no evidence on the point was introduced. It was alleged in the objection to the probate of the instrument that it was a forgery made pursuant to a conspiracy to which the daughter was a party, but this allegation is not repeated in the objections to her petition for distribution . . . . [¶] It is to be noted that there is no proof in this proceeding that the instrument of December 25, 1915, was, in fact, spurious. All that appears is that the petition for its probate was withdrawn, and also the fact that a certain person was convicted of the crime of forging it. But neither the dismissal nor the criminal conviction is competent evidence in the present proceeding that it was not genuine. . . . [¶] . . . [¶] . . . [I]t is easy to conceive of a beneficiary offering for probate, purely through a sense of duty to the decedent, what he believes to be the genuine expression of the testator's last desire without any purpose whatever of defeating a prior will and without any interest in defeating it. Many a child has still such regard for his parent that he or she would endeavor to establish and carry out what was believed to be the father's will, although so doing is directly contrary to his or her own material interest. In such a case there is no element of an 'attempt to defeat' a prior will. [¶] *It follows that an attempt in good faith to probate a later purported will, spurious in fact, but believed to be genuine by the party seeking its probate, does not fall within the forfeiture clause under consideration here.*" (*Estate of Bergland, supra*, 180 Cal. at pp. 634-636, italics added & omitted.)

Again, the facts known to Jorge when he offered the 1998 will to probate, as established by the evidence introduced in the seven-day trial, distinguish the instant case from *Estate of Bergland, supra,* 180 Cal. 629.

The other case Jorge mentions in his reply brief is a case from Colorado, *In re Estate of Peppler* (Colo.Ct.App. 1998) 971 P.2d 694. In *Peppler,* the testator in 1984 executed a will leaving $40,000 to his daughter, and most of the balance of his estate to his son. That will contained a no contest clause. After the testator died, his daughter filed a petition for probate of a 1992 will that contained provisions more favorable to her than those in the 1984 will. The personal representative objected to admitting the 1992 will to probate. After a three-day bench trial, the district court denied admission of the 1992 will to probate, finding that testator lacked testamentary capacity to execute it and that it was the product of undue influence exerted upon testator by his daughter. The personal representative then brought an action to enforce the no contest clause in the 1984 will against the daughter. He contended the daughter's attempt to admit the 1992 will to probate constituted an attack on the 1984 will within the meaning of the no contest clause and that therefore she forfeited her right to the $40,000 bequest.

The trial court declined to order enforcement of the no contest clause. The Court of Appeal, however, reversed and remanded, concluding that further proceedings were required to determine whether the no contest clause should be enforced. Citing *Estate of Bergland, supra,* 180 Cal. 629, the court held that the offer of a subsequent will for probate did constitute an attack on the prior will, triggering the no contest clause. However, the court also held that the finding of undue influence does not, as a matter of law, preclude applying a good-faith probable-cause exception to enforceability of no contest clauses. The court explained, "Courts have generally declined to enforce no-contest clauses where the beneficiary challenging the will acted in good faith and had probable cause for the challenge. [Citations.] [¶] 'Probable cause,' in the context of attacks on wills, is defined as 'the existence, at the time of the initiation of the proceeding, of evidence which would lead a reasonable person, properly informed and advised, to conclude that there is a substantial likelihood that the contest or attack will be successful.' [Citations.] One factor which bears on the existence of probable cause is that the beneficiary relied upon the advice of disinterested counsel sought in good faith after a full disclosure of the facts. [Citation.] [¶] The good faith-probable cause exception to enforcement of a no-contest clause has been applied in cases where the asserted attack or contest consists of offering a later will for probate. [Citations.] [¶] . . . [¶] The personal representative contends that the probable cause exception cannot apply here

because the district court's finding of undue influence on the part of beneficiary established as a matter of law that beneficiary was not acting in good faith or with probable cause when she sought admission to probate of the 1992 will. [¶] . . . [¶] We decline to hold that, as a matter of law, a finding of undue influence precludes applying the good faith-probable cause exception. Under the particular facts and circumstances of a given case, there may be a basis for concluding that a beneficiary acted in good faith and with probable cause in offering a will for probate, even if it is later determined that the will was the product of undue influence. [¶] We cannot determine from the record before us whether this is such a case. The transcript of the bench trial regarding the 1992 will is not included in the record on appeal. The district court found at the conclusion of that trial that beneficiary had been 'well-intended in trying to do what she thought was right and best'; that it would not attribute any negative motive to her; that it thought the evidence showed the attorneys 'plotted this whole scenario and left [beneficiary] holding the bag'; and that she was simply following the advice she had been given. One year later, in ruling on the personal representative's request regarding enforcement of the no-contest clause, the court again found that beneficiary was well-intended but had been badly advised by her attorneys. [¶] These findings indicate that the court believed beneficiary was acting in good faith when she obtained the 1992 will. However, while good faith is a relevant consideration, the court's findings do not fully resolve the issue of whether there was probable cause for offering the 1992 will for probate under the standards for probable cause set forth above. For example, the definition of probable cause contemplates a determination of whether a 'reasonable person, properly informed and advised' would have concluded that the petition for probate of the 1992 will would succeed. Such a determination must be made in the first instance by the district court." (*In re Estate of Peppler, supra,* 971 P.2d at pp. 697-698.) Accordingly, the Court of Appeal remanded the cause to the district court for a determination of whether there was probable cause for institution of the proceedings regarding the 1992 will.

In the instant case, there is no need for a remand. A seven-day trial was held at which substantial evidence was presented. The findings were memorialized in Judge Turrone's statement of decision. No appeal was apparently taken from that proceeding. Judge Turrone found the evidence "robust" that Jorge actively participated in events causing his weak and disoriented near-death father to disinherit his other children in favor of Jorge. Under these circumstances, we affirm Judge Gallagher's order granting his sibling's "petition to determine entitlement to estate distribution to Jorge Gonzalez because he violated the will's forfeiture clause." (Capitalization omitted.)

## DISPOSITION

The judgment is affirmed. Each side to bear its own costs on appeal.

Premo, Acting P. J., and Elia, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 18, 2002.