Murriel SEYMOUR  *v.*  Gladys BIEHSLICH, Executrix;
The Estate of Floyd Davis, Deceased

07-63                                             266 S.W.3d 722

Supreme Court of Arkansas
Opinion delivered November 1, 2007

*William F. Sherman*, for appellant.

*Elmore & Smith*, by: *Barbara Elmore*, for appellee.

Tom Glaze, Justice. This appeal asks our court to determine what constitutes a will contest for purposes of an *in terrorem*, or "no contest," clause in a will. Mr. Floyd Ray Davis, Sr., died testate on May 18, 2002. On May 21, 2002, Mr. Davis's daughter, appellee Gladys Biehslich, filed a petition for probate of will and appointment of personal representative. Biehslich's proffered will was dated May 6, 2002; after making a few specific bequests, the will bequeathed the remainder of Mr. Davis's property in equal shares to his seven children and the children of his one deceased son. In addition, the will contained an *in terrorem* clause that provided as follows:

> If any one person [or] persons named [or] referred to in this instrument contest my will, that person [or] persons will automatically be dropped from my will and their part will be equally divided among the other parties named and/or referred to herein.

The Probate Division of the Lonoke County Circuit Court entered an order on May 21, 2002, granting Biehslich's petition, probating the May 6, 2002, will, and appointing Biehslich as personal representative.

On July 1, 2002, appellant Murriel Seymour, another of Mr. Davis's daughters, filed her own petition for probate of will and appointment of personal representative. In this petition, Seymour averred that Mr. Davis had left as his last will "a handwritten instrument dated May 13, 2002[.]" This will left $1,000 to be divided among Mr. Davis's other children and grandchildren, with the remainder of the estate to go to Seymour. The proffered will, although handwritten, was in Seymour's handwriting, not Mr.

Davis's, whom Seymour contended was illiterate. After a hearing on November 6, 2002, the circuit court denied Seymour's petition to probate the will in an order entered on November 13, 2002.

On November 3, 2005, Biehslich filed a motion to exclude Seymour from distribution under the will. Citing the no-contest clause in Mr. Davis's will, Biehslich asserted that, by offering the May 13, 2002, will for probate, Seymour contested the May 6, 2002, will and thus should be excluded from the distribution of assets from Mr. Davis's estate.

The circuit court held a hearing on Biehslich's motion on August 29, 2006. At the conclusion of the hearing, the court, noting that no-contest provisions are valid in Arkansas, ruled from the bench as follows:

> The issues in this case is [*sic*] whether or not the actions taken by Ms. Seymour constitute a contest and whether or not that is in compliance with the provisions found in [the no-contest clause of Mr. Davis's will], and the court finds that it does and the exclusion of distribution to the heir is granted.

The court entered an order to this effect on October 17, 2006. A subsequent order, entered on October 24, 2006, directed distribution of the estate to the remaining heirs. Seymour filed a timely notice of appeal on October 24, 2006, and now raises three points on appeal.

Our standard of review in probate cases is well settled. This court reviews probate proceedings *de novo* on the record, but it will not reverse the decision of the circuit court unless it is clearly erroneous. *Bullock v. Barnes*, 366 Ark. 444, 236 S.W.3d 498 (2006); *Craig v. Carrigo*, 353 Ark. 761, 121 S.W.3d 154 (2003). In conducting our review, we give due regard to the opportunity and superior position of the trial judge to determine the credibility of the witnesses. *Bullock, supra.*

In her first point on appeal, Seymour argues that the trial court erred in concluding that she had contested the will in probate. Similarly, in her second argument, she contends that her filing of a conflicting will did not constitute a contest of the first will's validity. Because these two arguments are essentially the same, we treat them together.

At the outset, Seymour concedes that our court has recognized the validity of no-contest clauses since at least 1937. *See Ellsworth v. Arkansas Nat'l Bank*, 194 Ark. 1032, 109 S.W.2d 1258

(1937). In *Lytle v. Zebold*, 235 Ark. 17, 357 S.W.2d 20 (1962) (*Lytle II*), this court noted that, "[s]ince the testator may leave his property to anyone he chooses, he is at liberty to exclude from his bounty those beneficiaries who unsuccessfully seek to thwart his testamentary wishes." 235 Ark. at 18-19, 357 S.W.2d at 21.

Nonetheless, Seymour contends that her attempt to probate the May 13, 2002, will was not a challenge to the May 6, 2002 will. In support of her argument, she cites Ark. Code Ann. § 28-40-113 (Repl. 2004), which sets out the proceedings for contesting a will. Under that statute, an interested party may contest a will "by stating in writing the grounds of his or her objection and filing them with the court." Ark. Code Ann. § 28-40-113(a) (Repl. 2004). Seymour asserts that she never made a written objection to the will, and thus, she cannot be said to have challenged the will. She also points to her testimony at the August 29, 2006, hearing, wherein she stated that she had no idea there was another will, and that she had "bent over backwards to make sure" she did not contest the May 6, 2002, will.

In *Lytle II*, *supra*, this court held that an earlier lawsuit challenging the validity of a trust constituted an "attack[ ] upon the validity of the testamentary scheme." In the earlier lawsuit, *Lytle v. Zebold*, 227 Ark. 431, 299 S.W.2d 74 (1957) (*Lytle I*), five of eight named beneficiaries of W. W. West's estate contended that the trust established in West's will was invalid for several reasons. This court rejected their arguments, and following the decision in *Lytle I*, the executor of West's estate filed a petition for instructions regarding the distribution of the estate. In essence, the petition questioned whether those five beneficiaries had forfeited their interest in the trust by filing the earlier proceedings. The probate court determined that the first proceeding "violated the no-contest paragraph in the will and effected a forfeiture of the rights of the five complaining beneficiaries." *Lytle II*, 235 Ark. at 18, 357 S.W.2d at 21.

On appeal, this court affirmed, concluding that it "[could not] agree with the appellants' insistence that the earlier proceeding sought merely a construction of the will rather than its invalidation." *Id.* at 19, 357 S.W.2d at 21. The court further noted as follows:

> [T]he dissatisfied beneficiaries contended that the testamentary trust was invalid and that the property should be distributed as if the testator had died intestate. Our opinion [in *Lytle I*] discussed and

rejected three separate attacks upon the validity of the testamentary scheme. We cannot avoid the conclusion that the first petition was the very type of proceeding that the testator intended to forbid.

*Id.*, 357 S.W.2d at 21-22.

This court also considered a no-contest clause in *Jackson v. Braden*, 290 Ark. 117, 717 S.W.2d 206 (1986), in which the assets of Bob Bailey's estate included mineral interests. The executor of Bailey's estate sought permission to lease and sell some of the mineral acreage, and although the probate court authorized the leases and sales, no appraisals or confirmations of those leases and sales were ever performed. In 1979, the beneficiaries under the will each received checks from the executor for their interests in the sales and leases. In April of 1982, however, the beneficiaries filed a petition in probate, challenging the fact that there had never been an appraisal or confirmation of the sales and leases. The trial court found that, by accepting the checks, the beneficiaries ratified the action of the executor. *Jackson*, 290 Ark. at 118, 717 S.W.2d at 207.

On appeal, the *Jackson* court affirmed the trial court's decision regarding the beneficiaries' ratification of the sales. However, on cross-appeal, the court rejected the cross-appellant's argument that, by challenging the sales, the beneficiaries had triggered a no-contest clause in Bailey's will. The court held instead that the beneficiaries were not attempting to defeat the will, and noted that the time for filing a will contest had long since expired. *Id.* at 120, 717 S.W.2d at 208. Instead, the court stated that the beneficiaries "acknowledged the validity of the will and, rather than attacking it, were questioning the actions of the executor for not complying with the probate code." *Id.*

Seymour likens her situation to that of the beneficiaries in *Jackson*, asserting that she did not challenge the validity of Mr. Davis's May 6, 2002, will. However, her actions belie her contentions. By submitting a second will — drafted a week after the first will, in Seymour's handwriting, and leaving the bulk of the estate to her — Seymour clearly challenged the validity of the first will. In *Ellsworth v. Arkansas National Bank, supra*, this court noted the definition of the word "contest" as "[t]o make a subject of litigation; to dispute or resist by course of law; to defend, as a suit; to controvert." 194 Ark. at 1040, 109 S.W.2d at 1262. By offering the second will for probate, we conclude that Seymour disputed the validity of the first will.

While there appears to be no Arkansas case law on the specific question of the effect of proffering a subsequent will for probate, our decision is bolstered by cases from other jurisdictions that indicate that such an action, if not undertaken in good faith, can constitute the kind of challenge that triggers a will's no-contest clause. For example, in *In re Estate of Westfahl*, 674 P.2d 21 (Okla. 1984), the Oklahoma Supreme Court noted that the word "contest," "as it pertains to a no-contest clause is defined as any legal proceeding designed to result in the thwarting of the testator's wishes as expressed in the will." 674 P.2d at 24. The court explained further as follows:

> [T]he consensus rule is that the forfeiture clause should not be invoked if the contestant has probable cause to challenge the will based on forgery or subsequent revocation by a later will or codicil. An attempt in good faith to probate a later purported will, spurious in fact, but believed to be genuine by the one presenting it for probate, does not render the offeror subject to the forfeiture provisions of no contest clauses if . . . she has probable cause to believe that the instrument is genuine and entitled to probate. . . .

> There is a legal obligation to produce a will for probate by one who has custody of the will. However, an attempt to probate a will, known not to be a genuine instrument, falls within the forbidden behavior of the *in terrorem* clause, and will result in the sacrifice of the legatee's . . . share.

*Id.* at 25.

The Colorado Court of Appeals discussed a similar situation in *Estate of Peppler v. Connelly*, 971 P.2d 694 (Colo. Ct. App. 1998). Agreeing that the offering of a later will for probate can constitute a contest of an earlier will, the Colorado court noted that courts have generally declined to enforce no-contest clauses where the beneficiary challenging the will acted in good faith and had probable cause for the challenge. *Estate of Peppler*, 971 P.2d at 697. "Probable cause," in the context of will contests, was defined as "the existence, at the time of the initiation of the proceeding, of evidence which would lead a reasonable person, properly informed and advised, to conclude that there is a substantial likelihood that the contest or attack will be successful." *Id.* (citing Restatement (Second) of Property § 9.1 cmt. j). Among the factors the Colorado court noted as bearing on the existence of probable cause was whether the beneficiary had relied upon the

advice of disinterested counsel sought in good faith after full disclosure of the facts. *Id.*

A California court of appeals also considered what was meant by "probable cause" or "reasonable cause" in *Estate of Gonzalez v. Gonzalez*, 126 Cal. Rptr. 2d 332 (Cal. Ct. App. 2002). In that case, the youngest of four children, Jorge Gonzalez, had been appointed executor of the estate of his father, Jose Gonzalez, in a 1992 will; the 1992 will contained a no-contest clause. Shortly before Jose's death, in March of 1998, Jorge had Jose sign a deed that transferred title of Jose's house to Jorge; in addition, Jorge had his father execute a will that essentially disinherited Jose's other children and left the entire estate to Jorge. *Estate of Gonzalez*, 126 Cal. Rptr. 2d at 333. After Jose's death, another son, Roy, who was apparently unaware of the existence of either the 1992 will or the 1998 will, filed a petition for letters of administration. Jorge then offered the 1998 will for probate. The brothers each objected to the other's petition, and their sisters also eventually filed petitions related to the will. *Id.* at 334.

After a trial on the matter, the lower court determined that Jorge had procured the 1998 will by undue influence, finding that Jose had been near death at the time and had not been given an opportunity to review the will (and that he was so disoriented, he likely would not have comprehended it if he had reviewed it). Thus, the court denied probate of the 1998 will. *Id.* at 335. Following that decision, one of the sisters was appointed executor of the estate, and she filed a petition to have Jorge excluded from the 1992 will for having violated its no-contest provision. *Id.* The trial court reviewed the earlier proceeding and found that Jorge had violated the 1992 will's no-contest clause and had thus forfeited any interest he had under that will. *Id.*

On appeal, Jorge argued that the no-contest clause should not be enforced because he had reasonable cause to offer the 1998 will for probate. The California Court of Appeals disagreed, rejecting his argument that he was required by statute to have the validity of the 1998 will determined before he could submit the 1992 will to probate. The court held that this statute would not shield him unless he had reasonable cause to believe that the 1998 will might be valid. *Id.* at 337. The court also rejected Jorge's argument that he believed the 1998 will was valid because he relied on the advice of an attorney who concluded that Jose was competent when he signed the 1998 will. The court held that, even

applying an objective standard, no reasonable person could conclude that the 1998 will was not the product of undue influence. *Id.* at 338–39.

In the instant case, while the trial court did not specifically state its reasons for declaring that Seymour's petition to probate the May 13 will invoked the no-contest provision in the May 6 will, we hold that sufficient evidence is found in the record to support a conclusion that Seymour was not acting in good faith when she procured the May 13 will and offered it for probate.[1] Seymour testified that she wrote the will in her handwriting because her father was "almost illiterate" and because he was so ill with cancer at that time that he could not raise his arm. In addition, she conceded that he "signed" the will with an "X" even though that was not his usual signature. Seymour further testified that she had asked her father whether he had signed another will, although she said that he indicated he did not know if he had. Regarding the drafting of the handwritten will, Seymour testified that she "got a piece of paper and I wrote what I could and then I read it to him and I asked him, 'Is this what you wanted?' " Only at that point did she call two friends to her father's hospital room to attest to the instrument. We also take note of the fact that the handwritten will left nearly the entire estate to Seymour, leaving only $1000 to be divided among the other heirs.

As mentioned above, we review probate matters *de novo* but will not reverse probate findings of fact unless they are clearly erroneous. *McAdams v. McAdams*, 353 Ark. 494, 109 S.W.3d 649 (2003). A finding is clearly erroneous when, although there is evidence to support it, we are left on the entire evidence with the firm conviction that a mistake has been committed. *Id.* We also defer to the superior position of the lower court sitting in a probate matter to weigh the credibility of the witnesses. *Id.* This court has also held that "it has been the 'invariable practice' of the court not to remand a case to [circuit] court for further proceedings and proof where we can plainly identify the equities of the parties." *Four County Regional Solid Waste Mgmt. Dist. Bd. v. Sunray Services, Inc.*, 334 Ark. 118, 971 S.W.2d 255 (1998); *see also Norman*

---

[1] At the November 6, 2002, hearing, Seymour averred that she was not attempting to probate the will as a holographic will, as the document was not in the handwriting of the testator.

*v. Norman*, 333 Ark. 644, 970 S.W.2d 270 (1998) (noting that "it is well settled that we have the power to hear [probate] cases *de novo*, and we have said that we do not remand [probate] cases when the facts have been developed fully in the record before us, as it would be pointless to remand for further evaluation"). Because there is ample evidence in the record demonstrating that Seymour was not acting in good faith when she proffered the later will, we affirm the trial court's finding that her actions triggered the no-contest clause in Mr. Davis's will.

Seymour also challenges the trial court's decision to distribute the estate without giving her notice. Here, she maintains that there is "no evidence of record that any of the heirs received legal notice of the hearing set on the final accounting in the matter," and she argues that the trial court's actions violated Ark. Code Ann. § 28-1-112 (Repl. 2004), which sets out the rules for providing notice under the probate code.

Seymour's argument is entirely without merit. The trial court entered an order on October 17, 2006, excluding Seymour as a distributee of the estate. On October 19, 2006, the court sent out a "notice of hearing on final distribution and discharge," noting that a hearing was scheduled for October 25, 2006. That notice was addressed to Ellen Justice and Joyce Thompson, two of Seymour's and Biehslich's sisters. Also on October 19, 2006, Seymour's attorney received a faxed copy of the notice of hearing on the final distribution. Prior to the scheduled hearing, however, the court entered an order on October 24, 2006, directing distribution of the estate and discharging Biehslich as personal representative. That order directed that the remaining heirs[2] should each receive $28,946.32. Between October 26, 2006, and October 31, 2006, each of the children and grandchildren entered receipts of distribution, acknowledging that they had received their share of the estate. Biehslich's report of final distribution was entered on November 1, 2006.

On appeal, Seymour concedes that she received actual notice of the hearing; moreover, she also admits the possibility that, having been excluded from the estate, she might not have been entitled to notice of the hearing. Nonetheless, she argues that

---

[2] These were Doloris Collins, Ellen Justice, Gladys Biehslich, Joyce Thompson, Jerry Davis, Johnny Davis, and the children of Floyd Davis, Jr. The grandchildren's share was divided equally among them, with each receiving $4,135.18.

there was a failure to comply with Ark. Code Ann. § 28-1-112, in that there were no waivers of notice filed from three of the designated beneficiaries, and no proofs of service were filed of record.

■ Section 28-1-112(a) provides that notice need be given "to interested persons . . . only when and as specifically provided for in the Probate Code or as ordered by the court." The Probate Code defines an "interested person" as "any heir, devisee, spouse, creditor, or any other having a property right, interest in, or claim against the estate being administered[.]" *See* Ark. Code Ann. § 28-1-102(a)(11) (Repl. 2004). Because Seymour had already been excluded from the distribution as an heir of the estate, she was not an "interested person" under the statute, and so there was no legal requirement that she be served notice. *See Lytle II, supra* (appellants, having forfeited their interest in the estate, were not in a position to question the distribution of the estate).[3]

Further, to the extent that Seymour argues that error resulted from the failure to send notice to several of the other heirs, she lacks standing to raise an argument on behalf of parties who have not appealed. *See Insurance from CNA v. Keene Corp.*, 310 Ark. 605, 839 S.W.2d 199 (1992) (citing *Hurley v. Bevens*, 57 Ark. 547, 549, 22 S.W. 172, 172 (1893) ("Judgments, though erroneous as to parties who do not appeal, will not be reversed upon the appeal of a party as to whom there is no error.")).

■ Finally, while Seymour briefly argues that her due process rights were violated when the circuit court ordered distribution of the estate without considering her motion for continuance, she concedes that she failed to raise this argument in the trial court. It is axiomatic that we will not consider arguments raised for the first time on appeal. *See Cloud v. Brandt*, 370 Ark. 323, 259 S.W.3d 439 (2007); *McLane Southern, Inc. v. Davis*, 366 Ark. 164, 233 S.W.3d 674 (2006).

Affirmed.

---

[3] Even if Seymour had been entitled to notice, she admits that she had actual notice of the hearing; accordingly, she cannot claim to have been prejudiced in any way. *See, e.g., Holt Bonding Co. v. State*, 328 Ark. 178, 942 S.W.2d 834 (1997) (noting that, even if the State had failed to comply with the notice and service requirements of a particular statute, the appellant could show no prejudice because it had received actual notice that proceedings had been instituted).