Cite as 2025 Ark. App. 348

# ARKANSAS COURT OF APPEALS
DIVISION IV
**No.** CV-23-66

| | |
|---|---|
| CAROLINE LASITER | **Opinion Delivered** June 4, 2025 |
| APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FIFTH DIVISION [NO. 60CV-19-2642] |
| V. | |
| NEWLAND & ASSOCIATES, PLLC, AS TRUSTEE OF THE MICHAEL ALLEN LASITER REVOCABLE TRUST AND AS TRUSTEE OF THE MAL IRREVOCABLE INSURANCE TRUST | HONORABLE WENDELL GRIFFEN, JUDGE |
| | AFFIRMED |
| APPELLEE | |

**RAYMOND R. ABRAMSON, Judge**

This is a companion case to *Newland & Associates, PLLC v. Lasiter*, 2025 Ark. App. 385, ___ S.W.3d ___ (case No. CV-23-818), also handed down today. Both appeals arise from a multifaceted dispute relating to the estate of Michael Allen Lasiter, deceased. Caroline Lasiter is Michael's widow. Newland & Associates, PLLC[1] ("Newland Trustee"), Michael's longtime legal counsel and financial, accounting, and estate-planning advisor, is the trustee of two trusts and the executor of a pour-over will that it prepared for Michael prior to his death. In this case, Caroline appeals from orders of the Pulaski County Circuit Court

---

[1]The law firm, Newland & Associates, PLLC, is described in the filings below as a one-stop shop of sorts, providing legal, accounting, financial, insurance, and tax services, holding itself out as a firm of "legal and accounting professionals."

granting summary judgment in favor of Newland Trustee, finding that she violated the *in terrorem*, or no-contest, clauses of the trusts and thereby forfeited all her beneficiary interest in the trusts. She was consequently ordered to return a total of $1,403,724.84 in trust property.

## I. *Facts and Procedural History*

Michael was diagnosed with cancer in 2015 and died on May 31, 2016. Caroline and Michael were married in March 2003. The marriage was Caroline's second and Michael's third. Caroline and Michael had two children, and Michael had two adult children from a previous marriage. Michael had accumulated substantial wealth by the time of his marriage to Caroline. Not surprisingly, Caroline and Michael negotiated a premarital agreement ("PMA").

In the PMA, Caroline and Michael agreed that all real and personal property acquired by either party before or during the marriage would remain each party's separate property and would be excepted from the definition of "marital property" under Arkansas law. They agreed to voluntarily relinquish all interest in the other party's separate property, including income, earnings, investments, and any enhancement in value, which accrued during the marriage. Caroline agreed "to waive any and all rights by reason of the marriage" in Michael's companies, including "any appreciation or increase in the value of the companies, which may or may not be attributable to the direct or indirect efforts or contributions of either party."[2] Caroline and Michael agreed that funds deposited into joint accounts and all

---

[2]Section 3 of the PMA states that Michael was an owner of three closely held businesses, Lasiter Construction, Inc., Contractors Leasing Corporation, and Peck Investments, LLC. He provided to Caroline the financial statements of Lasiter Construction,

2

"wages earned by either party from any employment source and reported on a Form W-2" would be considered marital property, but all other income earned by either party "from his or her separate property" would not. Additionally, Caroline would acquire a marital one half interest of the equity in residences Michael owned at 1905 North Cleveland and 4 Broadview. Michael also agreed to maintain a term life insurance policy in the amount of $500,000 and to name Caroline as primary beneficiary.

Caroline and Michael came to this agreement "in release of and in full satisfaction" of all rights which either party might assert in the other's separate property by reason of their marriage. They agreed that in the event the relationship was terminated by death, neither party, as the surviving spouse, would "take, claim, demand or receive any interest in the Separate Property that comprises the estate of the deceased party." Additionally, they both expressly waived and released all claims, title, and interest in law or equity to:

> a. rights or claims of dower, curtesy or any similar or statutory substitute, as provided by the statutes of the state in which the parties, or either of them, might die domiciled or owning real property; . . .

> c. the right of election to take against the last will and testament, if any, of the other; . . .

> g. the right to act as administrator of the other's estate, or to nominate or appoint or otherwise designate any person as administrator of the estate of the other.

Caroline acknowledged that she was entering into the PMA "freely and voluntarily" and had been "advised fully by legal counsel of her choosing," attorney Barry Coplin.[3]

---

Inc., and Contractors Leasing Corporation, and the companies owned by Lasiter Construction, Inc., Redi-Crete, LLC, and Asphalt Products, LLC.

[3]Michael was advised by his longtime attorney, Richard Newland.

Caroline and Michael agreed that all terms and provisions of the PMA "shall be binding upon each of the parties hereto" and "enforceable by the respective heirs, personal representatives, transferees, successors or assigns of the parties hereto" and "may not be modified except in writing signed by the parties."[4]

At the time of his death in 2016, Michael had three operative estate-planning documents: (1) his Last Will and Testament, a pour-over will;[5] (2) the MAL Irrevocable Insurance Trust (the "Insurance Trust"); and (3) the Michael Allen Lasiter Revocable Trust as Amended and Restated the 19th day of February 2016 (the "Revocable Trust"). Michael executed the Insurance Trust on September 1, 2015, and he named Newland & Associates, PLLC, as trustee with the power to appoint a successor trustee. The primary purpose of the Insurance Trust is "to provide funds for the continued support, health, and education" of Caroline and Michael's children and descendants. The Insurance Trust was funded with two RiverSource policies of life insurance and collected approximately $15 million in proceeds upon Michael's death. The terms of the trust grant broad powers to the trustee, including the authority to modify or amend the trust agreement to achieve favorable tax status and to make loans out of trust property.

Section V(b) of the Insurance Trust provides for "Initial Distributions for the Benefit of Caroline Lasiter." It states that Caroline shall be paid $500,000 "outright and without

---

[4]*See* Ark. Code Ann. § 9-11-405 (Repl. 2020) ("After marriage, a premarital agreement may be amended or revoked only by a written agreement signed by the parties.").

[5]A pour-over will is an instrument, which upon death "pours" into a living trust any of a decedent's assets not previously transferred to the trust during their lifetime. *Black's Law Dictionary* 1921 (12th ed. 2024).

further trust administration" upon Michael's death. It also provides for the creation of a contingent trust share as follows: If Michael "has an active pilot's license at the time of his death, then Two Million Dollars ($2,000,000.00) shall be allocated to a separate trust share specifically for the benefit of Caroline Lasiter." However, in the event Michael "no longer maintains a pilot's license at the time of his death, then the distribution under this Section V(b)(2) shall be void." If the condition precedent is met and the separate trust share created, then the trustee, in its discretion, "shall pay such portion of the net income and principal of this Trust share to, or apply on behalf of, Caroline Lasiter at such time or times as shall be required to maintain and support her in the manner to which she became accustomed" during Michael's lifetime. In determining whether this condition precedent was met, Newland Trustee obtained the opinion of David Cahoon, an Arkansas attorney and FAA–certified flight instructor and designated pilot examiner. Mr. Cahoon concluded that Michael "could not legally exercise the privileges of his pilot's certificate without a valid and unexpired FAA medical certificate," which he did not have. Therefore, Mr. Cahoon concluded that in accordance with the language of Section V(b), the provision for the creation of a separate trust share for Caroline was void. Consequently, Newland Trustee did not create the separate trust share described in Section V(b)(2). Instead, the $2 million was kept with the other $14.5 million in life insurance proceeds to be distributed to Caroline and Michael's children and descendants in accordance with the terms of the trust.

The Insurance Trust includes the following "No Contest" provision:

> Any Beneficiary who shall contest in any court any provision of this trust shall not be entitled to any distributions or benefits under this trust. Any and all portions of the income or principal to be distributed as provided herein, otherwise provided to be paid to such person, shall instead remain a part of

the trust principal and be equally divided among the remaining Beneficiaries. The Trustee is specifically authorized to defend at the expense of trust principal and income any contest or attack of any nature upon this trust or on any paragraph or provision of this trust.

Michael executed the pour-over will on February 19, 2016, and appointed Newland & Associates, PLLC, as executor with the right to appoint its successor executor. The pour-over will leaves all of Michael's real and personal property, along with any residue, to the Revocable Trust, which Michael executed the same day. The pour-over will includes the following "No Contest" provision:

> Every heir, legatee, devisee, or beneficiary under this Will, and the trusts created in this Will, or intended to be created, who shall contest in any court any provision in this instrument, shall not be entitled to any devises, legacies, or benefits that they may otherwise be entitled.

The Revocable Trust, which became irrevocable upon Michael's death, "supersedes any prior version of the Trust, including the Michael Allen Lasiter Revocable Trust dated February 13, 1993, and the Michael Allen Lasiter Revocable Trust dated January 24, 2006, and any Trust amendment prior to the date of this Agreement." In the Revocable Trust, Michael named himself as trustee, while being able and willing, then Newland & Associates, PLLC, and he gave Newland & Associates, PLLC, the right to appoint its successor trustee. Michael provided that if Newland & Associates, PLLC, fails to appoint its successor trustee, then the then-acting Trust Protector shall appoint a successor trustee. Michael named his mother, Hannah Finley, as Trust Protector.[6]

---

[6]A "trust protector" or "trust director" is a nontrustee that is granted a power of direction by the terms of the trust over some aspect of trust administration, excluding the powers described in Arkansas Code Annotated section 28-76-105(b). Ark. Code Ann. § 28-76-102(5) & (9) (Supp. 2023).

6

Section Three of the Revocable Trust incorporates the PMA:

> The Prenuptial Agreement executed on March 10, 2003, by the Grantor and February 26, 2003, by the Grantor's Wife shall remain in full force and effect in accordance with its terms. However, the Grantor reserves the right to make additional provisions for the Grantor's Wife in this Trust, the MAL Irrevocable Trust dated September 1, 2015, or other estate planning devices executed subsequent to the date of this Agreement without waiving the provisions of said Prenuptial Agreement. It is the Grantor's intent that in the event of any conflict between the terms of the Grantor's effective estate planning documents and the Prenuptial Agreement, that the estate planning documents shall supersede the Prenuptial Agreement, provided that such terms do not reduce the Grantor's Wife's rights as provided in the Prenuptial Agreement.

In the Revocable Trust, Michael directed the trustee, upon Michael's death, to divide the trust estate into three separate shares, as necessary: the "Marital Deduction Trust Share," the "Lasiter Family Trust Share," and the "Lasiter GST Trust Share." Michael named Caroline as the sole income beneficiary of the Marital Deduction Trust Share as follows:

> Provided that the Grantor's Wife survives the Grantor, the Marital Deduction Share shall be equal to the sum of Five Million Dollars ($5,000,000.00). It is the Grantor's recommendation, but not requirement, that this portion of the Marital Deduction Trust Share be funded with primarily liquid assets. In addition to the Five Million Dollar ($5,000,000.00) allocation, the Marital Deduction Trust Share shall include the Grantor's personal property, unless otherwise specified herein or in a subsequent memorandum to this Trust, and any residences, or interests therein, owned by the Grantor or this Trust at the time of the Grantor's death. It is the Grantor's intent that the Marital Deduction Trust Share qualify for the estate and gift tax unlimited marital deduction.

In the Revocable Trust, Michael directed the trustee to "make a monthly distribution of the income of the Marital Deduction Trust Share" to Caroline in the amount of $5,000 "to be used for groceries, gas money, eating out, and other incidentals outside of the normal and ordinary expenses paid by the Trust pursuant to this Agreement" and Michael's directives. In addition, the trustee shall distribute to Caroline $25,000 each year on the

anniversary of Michael's death "provided that [she] has complied with all terms of this Agreement and any directives made by [Michael] as determined by the Trustee." Michael included that these distributions, however, "will not preclude additional distributions of principal to or for the benefit of [Caroline] if the Trustee determines that income distributions are insufficient for [her] continued health, maintenance, and support."

In the Revocable Trust, Michael "specifically directs the Trustee to follow any directives, whether written or oral, further detailing the Grantor's intent with regard to management or disposition of Trust assets." The Revocable Trust further states that it is Michael's "specific desire and direction that the Distribution Directives remain confidential and not be disclosed to any beneficiary hereunder, including the Grantor's Wife." Michael included, "In carrying out the Distribution Directives, the Trustee shall be deemed to be exercising absolute discretion as authorized by this Agreement and shall not be liable to any beneficiary hereunder for exercising such discretion and shall not be obligated to disclose the terms of the Distribution Directives forming the basis for the exercise of that discretion."

Michael also included in the Revocable Trust a procedure by which any beneficiary may object to any action taken by the trustee pursuant to the Distribution Directives. Relating to this procedure, the Revocable Trust includes a separate "No Contest" provision as follows:

> If the beneficiary continues to contest any provision of the Distribution Directives or pursues any legal action for the disclosure of the terms of the Distribution Directives, then such beneficiary shall not be entitled to any benefits under this Trust. Any and all devises, legacies, and portions of the income or principal of this Trust otherwise provided to be paid to such person shall lapse and shall be paid, distributed, and passed as though such person had predeceased the Grantor. The Trustee is specifically authorized to defend, at the expense of the Trust (and primarily to funds that would otherwise be

distributed to the challenging beneficiary) any contest or attack of any nature upon the terms of the Distribution Directives and specifically with regard to the confidentiality provision.

The Revocable Trust provides that a beneficiary's "right to object to the Distribution Directives shall not extend to the right to object to the terms of this Trust Agreement." Michael included that any objection to the terms of the trust will remain subject to the risk of forfeiture pursuant to the Revocable Trust's *in terrorem* clause:

> Every beneficiary under this Trust, and any other trusts created under the terms of this Trust, or intended to be created, who shall contest in any court any provision in this Trust Agreement, shall not be entitled to any benefits under this Trust. Any and all devises, legacies, and portions of the income or principal of this Trust, otherwise provided to be paid to such person, shall lapse and shall be paid, distributed, and passed as though such person had died prior to my death leaving no living lawful descendants. The Trustee named in this Trust is specifically authorized to defend at the expense of Grantor's estate any contest or attack of any nature upon this Trust, or on any paragraph or provision of this Trust Agreement.

As noted, Michael died on May 31, 2016. In the months following his death, Caroline sought the advice and counsel of several attorneys regarding Michael's estate plan. In a thirty-three-page letter, dated September 16, 2016, attorney Michael McCarty Harrison, with Watts, Donovan, Tilley, provided Caroline with a comprehensive summary of Michael's estate planning instruments.[7] Among other things, Ms. Harrison advised Caroline that the PMA *was in effect* at the time of Michael's death. She warned:

---

[7]Another attorney, Paul Parnell, with the Rose Law Firm, provided Caroline with a comprehensive memorandum, dated October 27, 2016. Mr. Parnell advised, "Generally, a trust can be set aside if the terms were the result of undue influence on the grantor[,]" but "[t]his will be difficult to prove, and *could potentially trigger the share cancellation provision*." (emphasis added). He explained that he would be advising Caroline "on the administration of the estate and trust," but attorney Jim Penick, with Eichenbaum Liles, P.A., would be pursuing Caroline's "separate priority" of removing Michael's mother as Trust Protector "and potentially contesting the terms of the trust."

9

> As you know, Michael's Will and the Trust specifically provide that *anyone who challenges the Will or Trust* is thereafter *disinherited*. Consequently, *I do not think it is in your best interest to do that*. Again, it appears the Trust has left you in a much better financial situation than you would have been in under the [PMA] alone. Consequently, this may not be something you want to challenge.

(Emphasis added.)

Ms. Harrison advised that Michael directed the trustee to carry out his confidential distribution directives at the trustee's "absolute discretion." She explained that Michael "put a great deal of time and consideration into the Distribution Directives, and he intends for it to be followed. Therefore, he requests that the Trustee and the beneficiaries be judicious in any deviation for or objection to the Distribution Directives out of respect for [his] wishes." She warned that continued contests to the distribution directives or any legal action for their disclosure could result in a forfeiture of benefits under the trust. She also warned: "*Any Court asked to rule on the matter would likely favor Michael's directives and intent for confidentiality and discretion on the part of Newland & Associates in carrying out his intent.*" (emphasis added).

Ms. Harrison further explained that it "is not unheard of for Trust grantors (Michael) to leave confidential directives for the Trustee (Newland & Associates) to follow, specifically with regard to minor children beneficiaries (as there are here) and/or where there are children from different marriages (as there are here)." She continued:

> Clearly Michael had a great deal of faith and trust in Newland & Associates, which I understand is concerning to you, for many reasons, not the least of which is you do not know for sure what the distribution directives state . . . coupled with the fact you may never have access to the distribution directives and any attempt to challenge same in a Court of law could well result in you being disinherited. *As such, I strongly urge you to be cautious in your approach to Newland & Associates and your dealings with it.*

(Emphasis added.)

But cautious, Caroline was not. According to Newland Trustee, she proceeded to engage "in an ever-accelerating series of letters . . . threatening to engage in conduct which would violate the *in terrorem* clauses." On February 10, 2017, through attorney Paul Parnell, she sent a letter to the trustee seeking to enforce the PMA, making "a claim and a demand" against Michael's estate for $500,000, and threatening litigation "if you do not pay this claim within fourteen (14) days of the date of this letter[.]" Newland Trustee responded that Caroline's "claim has already been satisfied," as she "has already been distributed $500,000 from the proceeds of an insurance policy" on Michael's life.[8] It further offered that Caroline "has also received or is entitled to receive far more benefits" under the Revocable Trust and Insurance Trust than Michael was obligated to provide under the PMA.

On February 22, 2017, through Ms. Harrison, Caroline sent a letter to the trustee challenging its determination relating to the pilot's-license contingency in the Insurance Trust.[9] She demanded the transfer of $2 million to a separate trust solely for her benefit and threatened litigation if it was "not allocated to her within 21 days from the date of this letter[.]" Newland Trustee denied this claim, explaining, "After due consideration, and

---

[8]According to the filings below, Caroline was paid $515,936.47 from the RiverSource policy for the $500,000 distribution plus her share of interest.

[9]Caroline submitted with her letter an opinion of her own "professional" regarding whether Michael's pilot's license was "active" at the time of his death. Per that opinion, Michael's "airman certificate" appeared to be "valid," in that it had not been surrendered, suspended, revoked, or expired. Michael's airman certificate, however, was not "*current*" for "operations of any type" because he did not have an airman "medical certificate." Therefore, as the opinion explains, "he would not have been in a position to exercise his privileges of his pilot certificate. In order to operate an aircraft as pilot in command, an airman's certificate must be both valid *and* current."

11

consultation with an Arkansas lawyer and pilot instructor, we reached the unmistakable conclusion that the prerequisites for the creation of the separate trust share were not met." It explained that under Section V(b)(3) of the Insurance Trust, any distribution under Section V(b)(2) is void if Michael fails to "maintain a pilot's license." It further explained that the separate trust share was not created because, as Caroline's own professional opinion had also concluded, Michael did not have a medical certificate at the time of his death and therefore "was not lawfully authorized to exercise his privileges as a pilot in command at the time of his death[.]"

On May 26, 2017, through Mr. Parnell, Caroline sent a letter to Newland Trustee expressing her "intent to pursue a claim against the Estate . . . to either have the [PMA] set aside or enforced pursuant to its terms." She stated that "[o]nce a probate estate is opened and the [PMA] is set aside," she intended to exercise her right to an elective spousal share and claim "1/3 of the Estate, or in this case, an amount well in excess of $15-million, outright and free of trust."

And that, she did. The very same day, she filed a "Petition for Probate of Will and Appointment of Administrator" in Pulaski County Circuit Court case No. 60PR–17–1049.[10] She alleged that Newland & Associates, PLLC, was "disqualified and unsuitable to serve as Executor of the estate" and disqualified "from selecting its successor." Accordingly,

_____

[10]Caroline subsequently filed an amended petition on June 8, 2017.

12

she sought the appointment of an administrator "so that [she] may properly present her claim against the Estate."[11]

Newland Trustee, in a June 2, 2017 letter, rejected Caroline's "onetime settlement offer . . . for a lump sum distribution to her of $15-million in cash and marketable securities" free of trust. In the letter, it also warned Caroline that any argument concerning Michael's intent with regard to allegedly revoking the PMA "*would constitute a challenge to Section Three of the Trust and* [*Michael's*] *Will*, which specifically revoked any prior codicils you referenced in your letter" and "*could implicate the in terrorem clauses* of Section Nine (f) of the Trust and the Sixth paragraph of the Will." (emphasis added). Furthermore, any election to take against the will "*would also trigger the in terrorem clauses.*" (emphasis added).

On August 21, 2017, Caroline filed a complaint against Newland & Associates, PLLC, and attorneys Richard Newland and Elizabeth Caldwell in Pulaski County Circuit Court case No. 60CV-17-4425, asserting claims of professional and ordinary negligence, conflict of interest, and breach of fiduciary duty.[12] Relating to Michael's estate, Caroline maintained that she was entitled to receive notice both of Michael's purported trust amendment "reactivating" the PMA and that Michael's existing life insurance policies, prior to the issuance of the new RiverSource policies, were being canceled or allowed to lapse.

---

[11]Caroline's disqualification efforts ultimately proved to be unnecessary, as Newland & Associates, PLLC, declined appointment as executor, and Caroline joined in its nomination of Relyance Bank, N.A., to serve as administrator of the estate, which the circuit court approved.

[12]These are the proceedings leading to the appeal filed in a companion case, *Newland & Associates, PLLC v. Lasiter*, 2025 Ark. App. 385, ___ S.W.3d ___, which we also hand down today.

13

On July 11, 2018, she filed an amended complaint adding the Insurance Trust as a defendant and asserting claims for breach of the trust agreement and declaratory judgment. She claimed: (1) that Michael's execution of the Insurance Trust vis-à-vis its pilot's-license provision required her prior "consent and approval"; (2) that the terms used therein are "ambiguous"; and (3) that she suffered damages in not receiving the $2 million resulting from the trustee's adherence to such terms. Despite her awareness of two professional opinions (one obtained by her own counsel) that Michael could not exercise the privileges of his pilot's license at the time of his death due to the lack of a medical certificate, she alleged that the trustees "were negligent in their assessment and review" of the pilot's-license provision. She sought to have $2 million paid over to her directly and, in addition, claimed that she "is entitled to receive a four percent income distribution annually[,]" purportedly pursuant to the terms of the Insurance Trust.

On November 13, 2017, Caroline filed a "Petition for Special Administration of the Estate" in separate probate proceedings in Pulaski County Circuit Court case No. 60PR–17-2352, nominating herself as the special administrator for purposes of "an investigation and pursuit of claims of the Decedent and his estate regarding malpractice claims" against Michael's "former attorneys, CPA's, financial advisers, and insurance brokers." She made these claims despite having previously consented to the appointment of Relyance Bank, N.A., as administrator of the estate in the general probate proceedings.[13]

On May 4, 2018, Caroline filed an Election to Take Against the Will in Case No. 60PR–17-1049, "renounc[ing] and disclaim[ing] any and all benefit under the Last Will and

_____

[13]Caroline subsequently voluntarily dismissed this petition.

14

Testament of Michael Allen Lasiter dated February 19, 2016" and "elect[ing] to take from the estate of Michael Allen Lasiter only the property and benefits which, because of this election, will accrue to [her] under Ark. Code Ann. § 28-39-401, as amended." She filed this election despite the existing PMA, which she had previously acknowledged to be valid, in which she waived and released "all claims, title, and interest in law or equity which . . . she has or might have by reason of the marriage, including, but not limited to . . . rights or claims of dower" and the "right of election to take against the last will and testament" of Michael.

On May 18, 2018, Caroline filed a petition for declaratory judgment against Relyance Bank, N.A., as administrator of the Estate of Michael Allen Lasiter, in Pulaski County Circuit Court case No. 60CV-18-3282, seeking to have the PMA declared null and void. She admittedly filed this action in order to pursue her "Election to Take Against the Will." On May 25, she filed a claim against the estate in the general probate proceedings in case No. 60PR-17-1049, seeking an award "of any damages to which she may be awarded in the Declaratory Judgment[.]"

This brings us to the underlying proceedings that led to this appeal. On April 19, 2019, Newland Trustee filed a "Petition for Declaratory Judgment and Other Relief" requesting a determination and declaration of rights relating to the *in terrorem* provisions contained in the Revocable Trust and the Insurance Trust.[14] In the petition, it explained that Michael "engaged in substantial estate planning" after his cancer diagnosis in 2015.

---

[14]Newland Trustee filed an "Amended Petition for Declaratory Judgment and Other Relief" on September 20, 2019.

According to Newland Trustee, Michael was concerned about Caroline's "extravagant spending" and ensuring that all his children were provided for and "believed that he needed a strong estate plan to manage these difficult family dynamics." Newland Trustee said that Michael's estate plan was "at least partially" designed to keep Caroline's "spending in check," and Michael's overall intent was that all four of his children and Caroline "have a secure financial future." Michael, however, according to Newland Trustee, was concerned about Caroline "challenging his provisions regarding the management of assets and distributions to her" and "specifically included the *in terrorem* provisions" in the trusts.

According to the petition, in the first year alone following Michael's death, Caroline received over $3 million in assets outright and via distributions from the Revocable Trust and the Insurance Trust. In addition, she continued to receive monthly distributions for her benefit averaging approximately $13,000 a month, plus the ability to request additional discretionary distributions.[15] The distributions Caroline received from the Revocable Trust were made from the Marital Deduction Trust Share. According to Newland Trustee, as of March 31, 2019, Caroline had received cash distributions to or for her benefit totaling $956,761.96 in addition to the distribution of various vehicles, boats, and other personal property valued at approximately $457,214.

Newland Trustee contended that despite these transfers, Caroline filed contests advancing claims that challenge provisions of the Revocable Trust and the Insurance Trust.

---

[15]According to Newland Trustee, Caroline asked the trustee for additional funds, and at times her requests were granted. In some instances, however, the trustee was required to deny her requests for funds or request additional supporting documentation for the requests to comply with the terms of the trusts.

It argued that while Caroline's above-mentioned "series of letters" do not themselves constitute a "contest" violating the *in terrorem* clauses, the legal actions that Caroline took to follow up on the threats contained in her letters do. It alleged that Caroline commenced an overall attack on Michael's estate plan, specifically, by filing (1) the Petition and Amended Petition for Probate of Will; (2) the Petition for Special Administration; (3) the Complaint and Amended Complaint against Michael's attorneys and the Insurance Trust; (4) the Election to Take Against the Will; (5) the Declaratory Judgment Action; and (6) the Claim Against the Estate. It contended that each of the foregoing constitutes a "contest" to provisions in either or both the Revocable Trust and the Insurance Trust and "an outright attempt to thwart [Michael's] express wishes." Accordingly, it requested a declaratory judgment that Caroline has violated the *in terrorem* clauses contained in both trusts, and she is, therefore, no longer a beneficiary of either Trust.

Newland Trustee also requested a declaratory judgment that Caroline be required to refund the distributions already made to her from the Revocable Trust in the amount of $956,761 and to return the personal property distributed to her or reimburse the Revocable Trust for the value thereof. It argued that the *in terrorem* clauses in both trusts contain "mandatory language" that any beneficiary that contests "any provision" of the instrument "shall not be entitled to any distributions or benefits" under the respective instruments. As such, it asserted that if it is determined that Caroline violated either or both of the *in terrorem* clauses, then "the Trustee has no discretion but to make no distribution to her under the applicable trust." Noting its duty "to administer the trust in accordance with its terms and purposes and the interests of the beneficiaries," citing Ark. Code Ann. § 28-73-801 (Repl.

17

2012), it maintained that it was obligated to enforce the *in terrorem* clauses' mandatory forfeiture to protect the rights of the other beneficiaries "in and to assets that otherwise would have been distributed to Caroline." Accordingly, it explained that it had "formed a separate investment account to receive, track, and account for the distributions that [Caroline] ordinarily would have received during the pendency of this matter."

As to the assets that have already been distributed to Caroline from the Revocable Trust, Newland Trustee maintained that it had the duty "to take control of and protect the trust property" and to "take reasonable steps to compel a . . . person to deliver trust property to the trustee[,]" citing Ark. Code Ann. §§ 28-73-809 and 28-73-812 (Repl. 2012). It noted that the Revocable Trust's *in terrorem* clause provides that in the event of a violation, "*any and all* devises, legacies, and portions of the income or principal of this Trust, otherwise provided to be paid to such person, shall lapse and shall be paid, distributed, and passed as though such person had died prior to [Michael's] death leaving no living lawful descendants." (emphasis added). It further noted that "[p]ursuant to Section Seven (a)(5) of the Revocable Trust, upon [Caroline's] death, the remaining Marital Deduction Trust Share principal is to be paid over to the Family Trust Share of the Revocable Trust to the extent it qualifies for the federal generation-skipping tax exemption and, to the extent it does not so qualify, then to the GST Trust Share of the Revocable Trust[,]" the beneficiaries of which are Michael's four children. Accordingly, it argued that because, under the express terms of the *in terrorem* clause, Caroline "forfeited the right to *any and all* distributions from the Revocable Trust[,] . . . the assets should be treated as if she had died prior to [Michael]." Therefore, it contended, Caroline is required to refund the distributions already made to

18

her from the Revocable Trust and to return the personal property distributed to her or reimburse the trust for the value of such property.

On May 20, 2019, Caroline filed a response and "Counter-Petition to Remove Newland & Associates, PLLC[,] as Trustee of the Revocable Trust and the Insurance Trust."[16] On August 27, 2019, she filed a motion for partial summary judgment that "[p]ursuant to Ark. Code Ann. § 23-51-165, Newland & Associates, PLLC, is unfit to serve as the trustee as a matter of law because it is not one of the types of entities permitted under Arkansas law to serve as trustee." She requested the entry of an order "holding that Newland & Associates, PLLC[,] is not qualified to serve as trustee of the Trusts, removing Newland & Associates, PLLC[,] as trustee of the Trusts, and appointing an independent corporate trustee to serve as trustee of the Trusts."

On September 20, 2019, Newland Trustee moved for partial summary judgment seeking judgment as a matter of law that Caroline's pleadings in other court proceedings, and her petition to remove the trustee in the instant proceedings, violated the *in terrorem* clauses of the trusts. On October 14, 2019, Caroline filed a cross-motion for partial summary judgment maintaining that her legal filings did not trigger the *in terrorem* clauses of the trusts because they do not constitute "contests" under Arkansas law. She argued that her challenges relating to Michael's estate plan were either based on independent sources of right or merely questioned the actions of the trustee.

---

[16]Caroline's counterpetition sought to remove the trustee pursuant to Arkansas Code Annotated section 28-73-706, which provides that a trustee may be removed if, among other things, the court finds that the trustee is unfit to serve. *See* Ark. Code Ann. § 28-73-706(b) (Repl. 2012).

On January 17, 2020, the circuit court convened a hearing on Caroline's summary-judgment motion relating to her counterpetition to remove the trustee and the parties' cross-motions for summary judgment on the issue of whether Caroline had violated the *in terrorem* provisions. Noting a dictionary definition of "contest" meaning "to compete for or in, to dispute, to challenge," the court concluded that Caroline's "legal filings can be viewed in my view as nothing less than contests to the trust." It continued, "To rule otherwise is to torture the meaning of contest and to ignore the plain import of those actions." It further noted that Caroline's electing to take against Michael's will and claim her statutory spousal share treats Michael's "testamentary planning as if there was nothing[,]" stating, "That's a point blank in your face challenge." Regarding Caroline's counterpetition claim to remove the trustee, the court found that it "ignores plain language in Arkansas statutes[,]" noting, "It has long been the law in Arkansas that an attorney at law is competent to serve as a trustee. You don't have to be an estate trust company to serve as a trustee."

The same day, the court entered a written order denying Caroline's motion for partial summary judgment and granting summary judgment in favor of Newland Trustee on the cross-motions. In its order, the court set out in greater detail Caroline's trust "contests," finding as follows:

> [Caroline] in 60PR-17-1049 seeks to have Newland & Associates, PLLC disqualified as executor of [Michael's] estate due to an alleged conflict of interest. This filing is in direct contravention of the Trust's naming of Newland & Associates, PLLC as Trustee and Administrator of the Estate.

> [Caroline] in 60CV-17-4425, seeks to challenge the provisions of the Revocable Trust that require the [PMA] to remain in effect upon [Michael's] passing and names the [Insurance Trust] as a party challenging the language used in the [Insurance Trust] with regard to a $2,000,000 trust share amount

20

to be set aside in the event [Michael] dies while holding an active pilot's license.

[Caroline], in 60PR-17-2352, seeks to appoint herself as Special Administrator of the Estate of [Michael] for the purpose of pursuing claims against Newland & Associates, PLLC in direct contravention of the [PMA] that waived such right.

[Caroline] in her Election to take against the Will Petition, in 60PR-17-1049, attempts to assert spousal claims and obtain up to $15,000,000 free from trust administration in direct contravention of the Trust distribution provisions.

[Caroline's] Petition for Declaratory Judgment against Relyance Bank, as Administrator of [Michael's] Estate in 60CV-18-3282 seeks to have the [PMA] deemed revoked or rescinded in direct contravention of the Trust provisions that state the [PMA] was to remain "in full force and effect" upon [Michael's] death.

Finally, [Caroline's] current Petition to challenge the fitness of Newland and Associates, PLLC to serve as a trustee ignores the plain language in Arkansas statutes.

> A limited liability company engaged in the practice of law, as a part of the practice of law, may act as an executor, trustee, or administrator of an estate, guardian for an infant, or in any other fiduciary capacity. Any member, employee of a member, manager, employee, or agent of a limited liability company engaged in the practice of law who is duly licensed as an attorney in this state may perform necessary fiduciary responsibilities on behalf of the limited liability company.

A.C.A. § 4-32-307. It has long been the law in Arkansas that an attorney at law is competent to serve as a trustee.

Moreover, the assertion that Newland & Associates, PLLC is unfit to serve as a trustee—in the face of that black letter law—is itself a contest to the Trust provisions.

For the reasons stated herein, the Court finds that [Caroline] contested Trust provisions, triggered the *in terrorem* clauses, and has hereby forfeited her rights as beneficiary under the M.A.L. Revocable Trust and M.A.L. Irrevocable Insurance Trust respectively.

21

On February 3, 2020, Caroline moved to vacate the court's January 17, 2020 order on the basis that it did not address two of her arguments: (1) that her interest in the Marital Deduction Trust Share is not subject to forfeiture under the *in terrorem* clause because such a forfeiture would result in disqualification as qualified terminable interest property (QTIP) in contravention of the terms of the Revocable Trust; and (2) that Newland Trustee is disqualified from serving as trustee under Arkansas Professional Conduct Rule 1.9. The circuit court denied the motion in a May 7, 2020 order, noting that it had "carefully considered all issues which were the subject of the Motions for Partial Summary Judgment filed by both parties, including the arguments raised again in [Caroline's] Motion to Vacate."

On December 14, 2020, Newland Trustee moved for summary judgment on its remaining claim seeking a determination that because Caroline violated the *in terrorem* clauses, she forfeited her entire interest in the trusts and must therefore return all funds and personal property, or the value thereof, distributed to her from the Revocable Trust.[17] It submitted, among other things, an affidavit of Elizabeth Caldwell, an attorney with Newland & Associates, PLLC, with supporting documents detailing the various distributions made to Caroline from the trust.[18] In her affidavit, Ms. Caldwell stated that monetary distributions, in a total amount of $946,510.84, were made to Caroline, including (1) monthly checks or direct deposits totaling $322,806.08; (2) a bonus distribution of $25,000; (3) payments for

---

[17]Newland Trustee did not seek repayment of distributions to Caroline from the Insurance Trust.

[18]Newland Trustee did not include as distributions Caroline's share of items, such as utility bills, home-maintenance expenses, or vehicle expenses, which also benefited Caroline's children, who also were beneficiaries of the Revocable Trust.

credit card charges totaling $256,565.56; and (4) the trust's share of proceeds from the sale of real property at 3 Broadview totaling $342,139.20. Additionally, Ms. Caldwell stated that Caroline received from the Revocable Trust, either outright or via entities owned by the trust, personal property worth a total of $457,214, the transfers of which are reflected in the supporting documents.[19]

In response, Caroline argued that Newland Trustee had "no tenable legal basis for the disgorgement that it seeks." Alternatively, she argued that summary judgment was "premature and founded in part on inadmissible evidence." She contended that "material discovery remains outstanding in this matter," discovery that she claimed she needed "to show, among other things, that many of the distributions alleged in Newland's Motion were in fact distributions of [her own] personal property made by independent legal entities that are, as both a matter of fact and matter of law, legally separate and apart from the Trust." She submitted, among other things, her affidavit stating that Newland & Associates, PLLC, had provided legal counsel to her from 2003 through 2016. She did not present any evidence refuting the distributions, or values thereof, presented by Newland Trustee.

In reply, Newland Trustee maintained that it had sufficiently established the value of the distributions made to Caroline via affidavit and supporting documentation pursuant to Arkansas Rule of Civil Procedure 56(e), and Caroline failed to meet proof with proof to dispute that information. It argued that Caroline's response merely sought to rehash her failed arguments in support of the earlier summary judgment. Additionally, it maintained

---

[19]From the supporting documents, it appears that the personal property included several vehicles, boats, and trailers.

that the entities from which Caroline had received distributions, specifically, Contractors Leasing Corporation, Redstone Construction Group, Inc., and ANW Investments, LLC, were owned by the Revocable Trust and made such distributions on behalf of the trust. In support, it submitted an affidavit of Matthew Dail, a CPA retained to perform accounting services for the Revocable Trust. In his affidavit, Mr. Dail described the entities in question and the transactions through which the ownership interests were transferred to Caroline.

On January 18, 2021, Caroline filed a motion to compel the production of "records sufficient to identify all payments received by Newland & Associates from the Trusts" and "records sufficient to identify all payments made by the Trusts to any persons or entities that have performed services on behalf of or for the Trusts." She contended that this discovery was material to the issues of whether an attorney-client relationship previously existed between herself and Newland & Associates, PLLC, and to its connection with the entities and transactions through which she received assets from the Revocable Trust. In response, Newland Trustee argued that (1) the discovery sought was not directed at the relevant claim, (2) Caroline lacked standing to compel discovery aimed at her counterpetition to remove the trustee, and (3) her motion to compel was untimely.

On May 18, 2021, the circuit court heard Newland Trustee's final motion for summary judgment relating to Caroline's reimbursement of distributions from the Revocable Trust and Caroline's motion to compel discovery. Newland Trustee argued that Mr. Dail's affidavit stood unrebutted and addressed each of the entities in question and established that each was owned by the trust at the relevant time. Caroline, on the other hand, argued that her affidavit proved that Newland & Associates, PLLC, had advised her

24

to put her own "separate assets" into the entities that transferred interests to her and, therefore, she was not required to return what were her own assets that had nothing to do with the Trust.

Relating to Caroline's motion to compel, the court inquired: "If [Caroline] contends that she has not received a benefit from the trust but has received a disbursement from companies she invested in, why does that not raise an issue that's relevant for discovery that would be within the grounds of the motion to compel?" Newland Trustee answered, offering several reasons: (1) the amounts of the distributions alleged had been known to Caroline since at least September 20, 2019; (2) Caroline previously agreed to produce "on a rolling basis" over 191,000 discovery documents in her possession; and (3) the discovery sought was aimed at an audit of the trust, not at discovering purported payments or transfers of assets by Caroline into any entity. Additionally, it noted that Caroline had raised an objection pursuant to Arkansas Rule of Evidence 1006 relating to the materials submitted in support of its summary-judgment motion. It explained that it had "produced the actual source documents" to Caroline and that "[t]here's no dispute with regard to the authenticity of those documents."

In resolving the issue, the circuit court made clear that it did not "intend to go backwards in history in this case[,]" stating that it had already ruled that Caroline "triggered the *in terrorem* clause[,]" "that she is no longer a beneficiary[,]" and "that she is no longer entitled to any benefits from the trust[.]" Accordingly, it ruled that Caroline was not entitled to compel discovery to audit the trust.

25

The court then homed in on the nature and scope of the remaining issue to be resolved: "I understand from [Newland Trustee] the lawsuit is about [Caroline] holding on to monies that she received before the Court made its ruling. I understand from [Caroline] that the lawsuit is about how much of those monies were hers as opposed to the trust." The court extended to Caroline an offer as follows: "If you've got some proof that goes to this, then file it within 15 days," and "I will decide then and there, whether or not, that raises a genuine issue of material fact . . . [in] dispute." It explained, "I'm going to tell you right now if they became entities of the trust, then my position is that settles it. If they didn't become entities of the trust, I have got another thing to think about."

On June 2, 2021, Caroline submitted her "proof"—her second affidavit with nineteen supporting exhibits. In her affidavit, Caroline pointed out what were, in her view, inconsistencies in certain statements made by Mr. Dail in his affidavit. Neither Caroline's affidavit nor any of the nineteen supporting exhibits, however, contradicted Mr. Dail's affidavit or other documents submitted by Newland Trustee.

On May 13, 2022, the circuit court entered a written order granting Newland Trustee's motion for summary judgment and denying Caroline's motion to compel. In its order, the court acknowledged that at the May 18 hearing, it had granted Newland Trustee's motion for summary judgment on the question whether reimbursement was required but had allowed Caroline additional time to submit proof as to whether the entities from which she received distributions were part of the trust. It further noted that Caroline had filed an affidavit and supporting exhibits on June 2, 2021. Accordingly, it issued its findings as follows:

10. In paragraph 10 of her June 2, 2021, Affidavit, [Caroline] stated under oath that, although she was unaware of this fact until her husband's death, "the books and records of ANW still reflected that Contractor's Leasing Corporation [w]as the sole member of ANW."

11. [Caroline's] Affidavit filed June 2, 2021, fails to refute [Newland Trustee's] proof or raise an issue of fact as to whether the Entities from which the distributions were issued were in fact part of the Trusts in this litigation, and the Court finds that said Entities were part of the Revocable Trust.

Additionally, the court found that of the $1,403,724.84 claimed by the trustee, "$737,767.14 constituted funds paid directly by the Revocable Trust." The remaining $665,957.70, it found, "constitutes distributions of personal property" from the entities that were part of the trust, "valued at $457,214.00 and funds in the amount of $208,743.70." Accordingly, it awarded Newland Trustee judgment against Caroline "in the aggregate amount of $1,403,724.84, plus post judgment interest at the rate of 2[.5]% from the date of entry of the Judgment until paid in full, for all of which execution and garnishment may issue."

On May 27, 2022, Caroline filed a "Motion for New Trial pursuant to Ark. R. Civ. P. 59 or, in the alternative, Motion to Vacate Order and Judgment pursuant to Ark. R. Civ. P. 60." Her motion was based on the following grounds: (1) that "key missing discovery" remained outstanding; (2) that "there exists disputed issues of material fact related to whether the LLC distributions are indeed distributions from the Trust at all"; and (3) that she was denied an opportunity to respond, in open court, to Newland Trustee's letter requesting the entry of a final order on its summary-judgment motion before the court entered Newland Trustee's proposed order. The circuit court denied the motion in a June 23, 2022 order resolving several pending motions, stating that "the above Motions and all other

27

pending Motions and requests for relief of each party are hereby denied as [Caroline] lacks standing, they are not well taken, or are moot."

## II. *Standard of Review*

Summary judgment may be granted only when there are no genuine issues of material fact to be litigated. *Jacks v. Brossett*, 2024 Ark. App. 6, at 14, 682 S.W.3d 362, 370. The burden of sustaining a motion for summary judgment is always the responsibility of the moving party. *Id.* Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.* at 15. On appellate review, this court determines if summary judgment was appropriate by deciding whether the evidentiary items presented by the moving party in support of the motion leave a material fact unanswered. *Id.* We view the evidence in the light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* Our review focuses not only on the pleadings but also on the affidavits and other documents filed by the parties. *Id.* When parties file cross-motions for summary judgment on a particular issue, they essentially agree that there are no material facts remaining in dispute, and we simply determine whether the appellee was entitled to judgment as a matter of law. *Abraham v. Beck*, 2015 Ark. 80, at 8, 456 S.W.3d 744, 750–51. As to issues of law presented, our review is de novo. *Id.*

## III. *Analysis*

### A. Removal of Trustee

Caroline argues that the circuit court abused its discretion in denying her motion to vacate that part of its January 17, 2020 order denying her motion for partial summary

28

judgment relating to her counterpetition to remove the trustee as "unfit" as a matter of law. In denying summary judgment, the circuit court ruled that Caroline's claim "ignores plain language in Arkansas statutes" permitting a law firm "limited liability company . . . to act as an executor, trustee, or administrator of an estate[.]"[20] Newland Trustees raises a jurisdictional issue that we must address before we may reach Caroline's argument. *See Cannady v. St. Vincent Infirmary Medical Center*, 2018 Ark. 35, at 10, 537 S.W.3d 259, 265 (noting that whether an order is subject to an appeal is a jurisdictional issue that the court has a duty to raise, even if the parties do not).

With certain exceptions not applicable here, the denial of a motion for summary judgment is not reviewable or appealable. *C&R Constr. Co., Inc. v. Woods Masonry & Repair, LLC*, 2020 Ark. App. 105, at 12, 596 S.W.3d 35, 43. We note that our supreme court has recognized an exception to this rule when, in denying a motion for summary judgment, the circuit court "engages in fact finding that effectively rules on a party's defense." *Cannady*, 2018 Ark. 35, at 11, 537 S.W.3d at 265–66. But, in this case, the circuit court did not engage in fact-finding in denying Caroline's summary-judgment motion. We note, too, that in some situations, "consideration of an appeal of the denial of a motion for summary judgment may be proper when considered in conjunction with an appeal of an order granting summary judgment in order to determine if factual disputes remain for trial." *Id.*

---

[20]In its order, the circuit court cited the Small Business Entity Tax Pass Through Act, Ark. Code Ann. § 4–32–307. The parties acknowledge that that Act was repealed by Act 1041 of 2021 and replaced with the Uniform Limited Liability Company Act, which provides that "[t]his chapter does not affect an action commenced, proceeding brought, or right accrued before September 1, 2021." Ark. Code Ann. § 4–38–1103 (Supp. 2023).

If, however, a review of the denied motion is not necessary to sustain the motion that was granted, an appeal is not proper. *Id.* Here, the circuit court denied Caroline's motion for partial summary [judgment] in the same order granting summary judgment in favor of Newland Trustee on the parties' cross-motions, finding that Caroline violated the *in terrorem* clauses and forfeited her interest in the trusts. Accordingly, Caroline, having no interest in the trusts, was no longer in a position to question the trustee's fitness. *See Lytle v. Zebold*, 235 Ark. 17, 20, 357 S.W.2d 20, 22 (1962) (appellants, having forfeited their interest in the estate, were not in a position to question the trustee's actions); *see also Seymour v. Biehslich*, 371 Ark. 359, 368, 266 S.W.3d 722, 729 (2007) (upon entry of order excluding her as distributee of estate, appellant was no longer an "interested" person entitled to notice of estate's distribution). Because a review of the denied motion relating to Caroline's counterpetition to remove the trustee is not necessary to sustain the motion that was granted, we do not consider Caroline's argument.

### B. *In Terrorem*, or "No Contest," Clauses

Caroline challenges the circuit court's finding that as a matter of law she "contested the Trust provisions, triggered the *in terrorem* clauses, and has hereby forfeited her rights as beneficiary" in the trusts. As mentioned, this issue was resolved on the parties' cross-motions for partial summary judgment. Therefore, we must determine whether Newland Trustee was entitled to judgment as a matter of law. *Abraham*, 2015 Ark. 80, at 8, 456 S.W.3d at 750–51.

Arkansas courts have recognized the validity of *in terrorem*, or "no contest," clauses dating back to at least 1937. *See, e.g., Jacks*, 2024 Ark. App. 6, at 15, 682 S.W.3d at 370

30

(collecting cases). Our supreme court in *Lytle* explained: "Since the testator may leave his property to anyone he chooses[,] he is at liberty to exclude from his bounty those beneficiaries who unsuccessfully seek to thwart his testamentary wishes." 235 Ark. at 18–19, 357 S.W.2d at 21. When construing a trust agreement, we look within the four corners of the trust instrument to determine the grantor's intent. *Warner v. Ford*, 2023 Ark. App. 537, at 7, 680 S.W.3d 439, 444. If the terms of the instrument are unambiguous, we construe it according to the plain meaning of the language used. *Id*. We determine the grantor's intent from the four corners of the instrument, giving meaning to all its provisions and each of its clauses. *Id*. Because *in terrorem* clauses "work a forfeiture," they are strictly construed. *Jacks*, 2024 Ark. App. 6, at 15, 682 S.W.3d at 370.

Thus, our analysis begins with "the plain words" of the *in terrorem*, or "no contest," clauses. *Hamm v. Hamm*, 2013 Ark. App. 501, at 5, 429 S.W.3d 384, 387. Here, the Insurance Trust's "no contest" clause states: "Any Beneficiary who shall *contest in any court any provision of this trust* shall not be entitled to any distributions or benefits under this trust." (emphasis added). Similarly, the Revocable Trust's *in terrorem* clause states: "Every beneficiary under this Trust, and any other trusts created under the terms of this Trust, or intended to be created, who shall *contest in any court any provision in this Trust Agreement*, shall not be entitled to any benefits under this Trust." (emphasis added). Our supreme court, in *Seymour*, cited with approval the Oklahoma Supreme Court's definition of "contest" as it pertains to a "no contest" clause: "any legal proceeding designed to result in the thwarting of the testator's wishes as expressed in the will." 371 Ark. at 364, 266 S.W.3d at 726 (citing *In re Est. of Westfahl*, 674 P.2d 21, 24 (Okla. 1984)).

While "it takes only one violation of the *in terrorem* provisions to trigger the forfeiture provisions[,]" *Jacks*, 2024 Ark. App. 6, at 22, 682 S.W.3d at 374, we find that, at a minimum, Caroline violated the *in terrorem* clauses of both trusts in four respects. First, Caroline triggered the "no contest" provision in the Insurance Trust by filing a lawsuit against the trustee seeking to recover damages based on the trustee's exercise of discretion in determining that the pilot's-license condition precedent was not met. The trustee's determination in this regard was supported by an opinion from an attorney and aviation professional, which was consistent, no less, with a separate professional opinion obtained by Caroline. We also note that the terms of the Insurance Trust provide that the trustee "shall not be liable for any mistake in judgment . . . or for any cause whatever except for the Trustee's own bad faith, willful misconduct, or gross negligence."

Additionally, in the lawsuit, Caroline sought to have $2 million paid over to her directly in addition to a distribution of 4 percent income annually. The Insurance Trust provides for neither distribution. Moreover, even if the pilot's-license condition was met, the terms of the trust do not provide for an outright distribution of $2 million to Caroline. Rather, $2 million is to be allocated to a separate trust share, and the trustee, "in its discretion," shall pay "such portion of the net income and principal . . . at such time or times as shall be required to maintain and support" Caroline "in the manner to which she became accustomed during the Grantor's lifetime." Caroline's lawsuit, therefore, does not seek to enforce the trust provisions as written and intended by Michael but instead mounts a direct attack on Michael's plainly stated intentions in the trust. Accordingly, the circuit

court properly found that Caroline forfeited her right to any distributions or benefits under the Insurance Trust.[21]

Second, third, and fourth, Caroline triggered the *in terrorem* clause of the Revocable Trust by filing an election to take against Michael's will, a declaratory-judgment action seeking to invalidate the PMA, and a claim against Michael's estate ultimately seeking to have funds paid over to her outside of trust and in addition to the funds she has already received pursuant to the trust agreement. In the PMA, Caroline voluntarily waived her rights to file an election to take against Michael's will, to claim a statutory spousal share of Michael's estate, and to claim any interest in Michael's separate property. The Revocable Trust incorporates the PMA and expressly states Michael's intention that the PMA is to remain in *full force and effect*. Michael, moreover, provided far more generously for Caroline in the trust than under the PMA alone. Accordingly, the circumstances in this case, we note, are far different from those in *In re Estate of Thompson*, 2014 Ark. 237, 434 S.W.3d 877, where the supreme court upheld a finding by the circuit court that the decedent intended to deprive his surviving spouse of her marital rights in his property by transferring his property to a trust.

The decedent in *Thompson*, whose property was valued at more than $6 million, had executed earlier trusts that provided his surviving spouse income for life and in the operative trust provided nothing to her except a $100,000 bequest, but only if she did not contest his

---

[21]We note that Newland Trustee does not seek repayment of the $500,000–plus paid outright to Caroline from the Insurance Trust. Nor does it seek repayment of any other distributions that may have been made to Caroline under the Insurance Trust either before or after Michael's death.

33

will and trust. 2014 Ark. 237, at 13–15, 434 S.W.3d at 884–85. Unlike the decedent in *Thompson*, Michael's intent, as it is clearly expressed in the trust, was *not* to deprive Caroline of her right to receive his testamentary estate. And Caroline does not allege that Michael intended to defraud her marital right to property. While our supreme court has recognized that a surviving spouse's right to an elective share is inviolate, *Hamilton v. Hamilton*, 317 Ark. 572, 578, 879 S.W.2d 416, 419 (1994), it is well settled that "parties contemplating marriage may, by agreement, fix the rights of each in the property of the other differently than established by law." *Franks v. Franks*, 2018 Ark. App. 266, at 8, 548 S.W.3d 871, 876. This is precisely what Caroline and Michael did when they negotiated the PMA. In sum, by filing the above-described legal actions, Caroline seeks to circumvent the terms of the Revocable Trust in their entirety and has contested Michael's entire estate plan and his express wishes. We hold that Caroline's actions, as a matter of law, violated the *in terrorem* provisions and resulted in a forfeiture of her interest in the Revocable Trust. We therefore affirm on this point.

## C. QTIP Election

Caroline argues that the circuit court abused its discretion by denying her motion to vacate the January 17, 2020 order relating to her argument that her interest in the Marital Deduction Trust Share is not forfeitable vis-à-vis application of the Revocable Trust's *in terrorem* clause. This is so, she contends, because such application is "at direct odds" with the terms of the Marital Deduction Trust Share, the Trustee Directives,[22] and Michael's express

---

[22]We note that the Trustee Directives are not included in the record on appeal. According to the parties, a separately executed Trustee Directive relating to the QTIP election, which contains language like that in the trust provision "voiding provisions that

34

intent. She maintains that "the Revocable Trust is clear that *any* directive, which would necessarily include the *in terrorem* clause, that disqualifies the Marital Deduction Trust as QTIP, is void and without effect." The language in question is found in Section Six (d)(3) of the Revocable Trust:

> (3) <u>Qualification</u>. As it is the intention of the Grantor that the Marital Deduction Share shall qualify for the QTIP election, all of the powers and discretions of the Trustee with respect to the administration of the Marital Deduction Trust Share shall be exercised in such a manner as may be required to assure its qualification for the marital deduction and its eligibility for the QTIP election, and *any provision of this Agreement which is determined to disqualify the Marital Deduction Trust Share for such deduction or election shall be void and without effect*.

(Emphasis added.)

According to Caroline, if the forfeiture is enforced, then Michael's bequest to her in the Marital Deduction Trust Share "would not qualify for the QTIP and the Revocable Trust would be required to pay a substantial amount in additional federal estate taxes." Therefore, she says, the *in terrorem* clause must be unenforceable. Her argument is unpersuasive. We need only zoom out and view all the trust provisions to see why.

First, the *in terrorem* clause tells us the result of Caroline's forfeiture: "any and all devises, legacies, and portions of the income or principal" made to her in the trust "shall lapse and shall be paid, distributed, and passed" as though she had died prior to Michael, leaving no living lawful descendants. Next, Section Six of the Revocable Trust directs the trustee to create, *as necessary*, three separate trust shares, including a Marital Deduction Trust

---

would disqualify the Marital Deduction Trust Share" for the QTIP election, is subject to a protective order in another case.

Share—but "[*p*]*rovided that the "Grantor's Wife survives the Grantor*[.]" (emphasis added). Because of the forfeiture clause, Caroline is deemed to have *not* survived Michael. Finally, the QTIP provision itself recognizes that there may be circumstances in which an election will fail in whole or in part:

> (d) <u>QTIP Election</u>. The following provisions shall apply with respect to the Trustee's election to treat all or part of the Marital Deduction Trust Share as qualified terminable interest property ("QTIP") for the purposes of qualifying for the marital deduction allowable in determining the federal estate tax upon the Grantor's estate:
>
> > (1) <u>Election Authorized</u>. The Trustee, in the Trustee's sole discretion, is hereby authorized to elect that all or any part of the Marital Deduction Trust Share passing under Section Six (a) of this Agreement be treated as QTIP property. Without limiting the discretion contained in the foregoing sentence, it is the Grantor's expectation that the Trustee will make said election with respect to all of the Marital Deduction Trust Share *unless the timing of the death of the Grantor's Wife and the Grantor in the computation of the combined estate tax liability on the estates of the Grantor and the Grantor's Wife render such an election inappropriate.*

(Emphasis added.)

Simply put, whatever the QTIP election's fate may be, it has no bearing on the *in terrorem* clause's enforceability. While we can appreciate Caroline's purported concern about estate tax consequences that her forfeiture may have caused, we would be remiss if we were to ignore the fact that it was she who contested Michael's estate plan and testamentary wishes and thereby accepted the risk of forfeiture and any consequences resulting therefrom. We cannot say that the circuit court abused its discretion in denying her motion to vacate. Accordingly, we affirm on this point.

36

D. Forfeiture

Caroline challenges the circuit court's grant of summary judgment ordering her to return over $1.4 million in funds and assets distributed to her from the Revocable Trust. She argues that there is no basis under either Arkansas law or the terms of the Revocable Trust for "disgorgement" resulting from her violation of the *in terrorem* clause. Her apparent difficulty locating any authority that addresses "disgorgement" in the context of an *in terrorem* clause results from a semantic fallacy. An abundance of authority says that *in terrorem* clauses result in "forfeiture." *E.g.*, *Jacks*, 2024 Ark. App. 6, at 15, 682 S.W.3d at 370. Indeed, that is precisely why such clauses are strictly construed and may not extend beyond the grantor's plain intent. *E.g.*, *Hamm*, 2013 Ark. App. 501, at 5–6, 429 S.W.3d at 387. We note, too, our holding in *Jacks* that a beneficiary of a will and trust violated *in terrorem* provisions, as a matter of law, resulting in forfeiture of her interests in both documents, and we therefore affirmed an order of the circuit court requiring the disinherited beneficiary to refund and deliver to the trustee "all assets, funds, income, property, and other items" she had received from the will and trust. 2024 Ark. App. 6, at 13, 682 S.W.3d at 369.

Caroline's argument presents this question: What exactly did she forfeit? The plain answer: Everything. The clear intent of Michael, as gleaned from the trust agreement, was to prevent conduct that would frustrate his thoughtfully designed estate plan. To discourage litigation contesting the provisions of the trust agreement, Michael included an *in terrorem* clause. The plain language of that clause says that any person who engages in such litigation "shall not be entitled to *any* benefits under this Trust." (emphasis added). In this event, "*any and all*" gifts provided to such person under the trust, whether real or personal property or

37

payments of portions of the trust income and principal, "shall lapse" as if the gift never occurred. *See Hamm*, 2013 Ark. App. 501, at 4, 429 S.W.3d at 387 ("An in terrorem clause in a will is one that voids a gift to a devisee or legatee, if the legatee or devisee disputes provisions of the will or the gift."). Hence, as the clause says, everything that Michael provided for Caroline under the trust "shall be paid, distributed, and passed" as though she predeceased Michael.

Although Caroline would have it otherwise, the language of the *in terrorem* clause plainly does *not* say that a person who challenges the trust agreement in court risks forfeiture of some, but not all, of the benefits provided for such person under the trust.[23] Accordingly, we agree with the circuit court that Caroline is not entitled to keep the over $1.4 million she received under the trust—particularly in these circumstances, given that she has elected to take *against* the trust agreement and is pursuing separate litigation to invalidate the PMA so that she can, instead, take her statutory share of Michael's estate. The issues presented in that litigation, of course, are not before us to untangle—at least not for today. We hold that Caroline must return the funds and assets she received from the Revocable Trust.

---

[23]As persuasive of Michael's intent that beneficiaries not be entitled to hold onto distributions received carte blanche, we note that the trust includes provisions for "Distributions Prior to Complete Funding of Trusts" and, in this context, states:

> Recognizing that the ultimate composition of such trusts may not be determinable until the Grantor's federal estate tax liability is finally determined, if any such preliminary distributions are in excess of the amounts ultimately determined to be payable, the recipient *shall return such excess to the Trustee for allocation or distributions to the proper trust or beneficiary*.

(Emphasis added.)

Caroline also argues that the circuit court erred by granting summary judgment because material facts remain as to whether all the interest transferred to her from the Revocable Trust was from the separate property of Michael. We disagree. From a review of the documents submitted below, ANW, LLC, was the only entity, out of the three in question, that did not exist when Caroline and Michael executed the PMA. Under the PMA, Michael's interest in ANW, LLC, constituted his separate property *unless* (1) ANW, LLC, was formed as a separate entity apart from "Lasiter Construction Inc., Contractors Leasing Corporation, and Peck Investments, LLC," *and* (2) he acquired his interest in it using marital property sources. As the circuit court noted, the summary-judgment evidence shows that ANW, LLC, was formed as a subsidiary of Contractors Leasing Corporation. Thus, Michael's interest in ANW, LLC, was his separate property. We also agree with the circuit court that Caroline failed to meet proof with proof to raise a material question of fact as to whether she acquired any interest in ANW, LLC, prior to Michael's death. Accordingly, we affirm the circuit court's grant of summary judgment.

We likewise reject Caroline's embedded argument that the circuit court abused its discretion in denying her motion to compel discovery. Caroline construes the basis for denial as lack of standing. From our review of the May 18, 2021 hearing, the circuit court found that the discovery Caroline sought was not relevant to the only remaining summary-judgment issue. We also note that the circuit court gave Caroline additional time to submit proof relating to that issue. We cannot say that it abused its discretion in denying her motion to compel and therefore affirm on this subpoint.

Caroline also argues that she was not afforded an opportunity to dispute the amounts of the distributions alleged by Newland Trustee. Her argument is unpersuasive. The circuit court conducted a hearing on Newland Trustee's summary-judgment motion relating to the return of $1,403,724.84 in distributions made to Caroline from the Revocable Trust. It even allowed Caroline to submit additional proof after the hearing was concluded, which Caroline did. The proceedings thereafter sat dormant for several months. Accordingly, Newland Trustee brought to the circuit court's attention the need for resolution and requested the entry of an order granting its motion for summary judgment and submitted a proposed order. The circuit court thereafter entered its order. In sum, Caroline received the process she was due. She simply did not meet her summary-judgment burden. Under these facts and circumstances, we cannot say that the circuit court abused its discretion in denying Caroline's motion for new trial or to vacate. Accordingly, we affirm on this subpoint.

Affirmed.

THYER, J., agrees.

HIXSON, J., concurs.

**KENNETH S. HIXSON, Judge, concurring**. I agree with the majority's holding that because Caroline contested the provisions in the Revocable Trust, this triggered the *in terrorem* clause and resulted in a forfeiture of her interest in the trust. I also reluctantly agree to affirm the trial court's order requiring Caroline to return the $1.4 million in funds and assets that had already been distributed to her from the trust based on the provision in the *in terrorem* clause that any beneficiary who shall contest the trust "shall not be entitled to any

40

benefits under this Trust." I write separately to express my concern about the potential practicality of this result.

It is a fundamental canon that, where possible, we should strictly construe no-contest clauses because applying them results in a forfeiture. *Hamm v. Hamm*, 2013 Ark. App. 501. In construing a testamentary document, we also carry out the testator's intention as it is expressed by the instrument's words. *Id.* Here, the *in terrorem* clause could have expressly provided but did not expressly provide for disgorgement or repayment of trust benefits in the event of a challenge to the trust after some of the trust benefits had already been paid to the beneficiary. Nevertheless, I cannot disagree with the majority that such repayment can fairly be ascertained from Michael's intent as stated in the *in terrorem* clause that the challenger of the trust "shall not be entitled to *any benefits*" under the trust. (Emphasis added.)

The potential problem with such a result in future cases, as I see it, is the situation in which trust funds and assets have been distributed to a beneficiary over a period of many years—with no objection by the beneficiary—and then the beneficiary contests one of the provisions therein. Under such circumstances, the beneficiary would undoubtedly risk forfeiture of any future benefits under the trust. But in that situation, would we expect the beneficiary to repay what had been properly administered to her by the trustee under the terms of the trust over the many years before the contest was made? From a practical standpoint, it may be unlikely that the beneficiary would still be in possession of the funds and assets previously paid, which would put her in an untenable position and lead to potentially harsh results.

I concur with the majority in affirming this case.

*Rose Law Firm*, by: *Paul Parnell*; *David S. Mitchell, Jr.*; *Ty Bordenkircher*; and *Bourgon B. Reynolds*, for appellant.

*James, House, Swann & Downing, P.A.*, by: *Patrick R. James* and *Charley E. Swann*, for appellee.